# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 09-22662-CIV-ALTONAGA/Brown

**SANJEEV SIRPAL**,

      Plaintiff,

vs.

**UNIVERSITY OF MIAMI**, *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court upon Defendants, University of Miami, James D. Potter, Ph.D., and Jose Renato Pinto, Ph.D.'s Motion to Dismiss Counts I–III, VI–VII, X–XII of Plaintiff's Amended Complaint, or, in the Alternative, Motion for Summary Judgment as to Counts XI and XII ("Motion") [D.E. 24], filed November 23, 2009.  The Court has considered the parties' written submissions and the applicable law.

## I.  BACKGROUND

### A.      Facts from the Complaint

Plaintiff, Sanjeev Sirpal ("Sirpal"), filed suit against the University of Miami (the "University"), James D. Potter, Ph.D. ("Dr. Potter"), Jose Renato Pinto, Ph.D. ("Dr. Pinto"), and Claudia Rodrigues, Ph.D. on September 8, 2009.  (*See* [D.E. 1]).  In his First Amended Complaint ("Complaint") [D.E. 20], Sirpal alleges twelve counts that arise from the University's decision to suspend or dismiss Sirpal from two professional programs.

Sirpal is an Asian-American graduate student of Indian heritage who was simultaneously a Ph.D. graduate student at the University's Department of Molecular and Cellular Pharmacology and

a medical student at the University's Miller School of Medicine (the "Medical School"). (*See* First Am. Compl. ("*Compl.*") [D.E. 20] ¶ 4). As a Ph.D. graduate student, Sirpal researched heart-muscle protein variants in Dr. Potter's laboratory and made a protein-related discovery. (*See id.* ¶¶ 9(c), 10). Dr. Potter, who is white, was the chairman of the Department of Molecular and Cellular Pharmacology. (*See id.* ¶¶ 6, 10). Dr. Pinto, a Brazilian post-doctoral fellow, also researched in Dr. Potter's laboratory. (*See id.* ¶ 7).

In June 2007, Dr. Pinto requested to participate in Sirpal's protein research and co-author an article Sirpal was working on for publication of his discovery (the "*JBC* article"); Sirpal refused Dr. Pinto's request. (*See id.* ¶¶ 11–14). In response, Dr. Pinto angrily told Sirpal, "You Indians are so smart. You get all the publications. I am a post-doc and I cannot get any publications." (*Id.* ¶ 15). Dr. Pinto also called Sirpal a "terrorist," "Towelhead," and "Habib," racial taunts which Dr. Potter tolerated. (*See id.* ¶¶ 49(a), 50(b)).

Thereafter, in February 2008, Dr. Pinto accused Sirpal of appropriating protein research samples from Dr. Pinto's laboratory freezer box. (*See id.* ¶¶ 25–27). Dr. Pinto asserted that he found several of his own research samples in Sirpal's freezer box with the labels rewritten in Sirpal's handwriting, and that he had not given Sirpal permission to use his samples. (*See id.* ¶ 26). Dr. Pinto interfered with Sirpal's relationship with the M.D./Ph.D. program when he falsely accused Sirpal of stealing protein samples. (*See id.* ¶ 86). Dr. Pinto made the accusations (1) "solely with ulterior purposes, i.e., to effectuate Pinto's racial bias and to get revenge against Sirpal for . . . rejecting Pinto's request for undeserved credit on the *JBC* article;" and (2) "without an honest belief that his actions concerning Sirpal's status as a Ph.D./M.D. student was [sic] in [the University's] best interest." (*Id.* ¶ 87).

2

CASE NO. 09-22662-CIV-ALTONAGA/Brown

Notwithstanding Sirpal's denial of the allegations, Dr. Potter "immediately" dismissed Sirpal from his laboratory. (*See id.* ¶ 28). Dr. Potter also reported the dismissal and Dr. Pinto's accusations to the Molecular and Cellular Pharmacology Graduate Program Committee (the "Graduate Committee") in a memorandum dated March 12, 2008 (the "March 12 memo"). (*See id.* ¶ 33). Dr. Potter specifically identified the protein misappropriations as the reason he was dismissing Sirpal from the lab. (*See id.* ¶¶ 33–34). In the March 12 memo, Dr. Pinto concluded:

> Because of [the alleged thefts], the members of my laboratory no longer feel that they can trust [Sirpal] or work with him in the future. These incidents have so upset the lab members, that it is no longer tenable for [Sirpal] to remain a member of my group. It simply would not be possible for the laboratory to function effectively if [Sirpal] were to remain. Thus, I made the decision to dismiss him from the lab.

(*Id.* ¶ 34). Dr. Potter made these statements within the scope of his employment at the University to other University employees. (*See id.* ¶ 91). But the statements are false; Dr. Potter maliciously accused Sirpal and intended to injure him. (*See id.* ¶ 92).

The Graduate Committee dismissed Sirpal from the Ph.D. program based on Dr. Pinto's allegations as forwarded to it by Dr. Potter. (*See id.* ¶¶ 33–34, 46(b)). Sirpal does not allege the Graduate Committee conducted an independent review before crediting Dr. Pinto's allegations. Sirpal then appealed the dismissal to the Associate Dean of the Medical School and the Dean of the Graduate School; both affirmed the Graduate Committee's decision. (*See id.* ¶¶ 46(d)–(e)).

Sirpal left various personal items and three years of original research related to his protein discovery in Dr. Potter's laboratory. (*See id.* ¶ 29). Specifically, he left: two three-ring binders that he had purchased, which contained experiment information; a portable jump drive that he had purchased, labeled "Dissertation Data;" two folders with records of Sirpal's fiber experiments; a catalogue of completed experiments; his dissertation proposals; his *JBC* article manuscript, including

3

drafts; and his lab book, which he also purchased.  (*See id.*).  Sirpal entrusted Dr. Potter's laboratory with these materials.  (*See id.* ¶ 128).  Dr. Potter, however, failed to provide secure storage for Sirpal's materials.  (*See id.* ¶ 129).  Sirpal's property is now missing; he alleges the University has converted his property to its own use and negligently cared for it.  (*See id.* ¶¶ 122, 131–34).

The University also suspended Sirpal from the Medical School.  The University based its suspension in part on Dr. Pinto's allegations of theft and in part on allegations of research misconduct.  (*See id.* ¶ 46(j)).  After Sirpal's dismissal from the Ph.D. program, questions arose regarding the validity of Sirpal's research supporting the *JBC* article.  (*See id.* ¶ 46).  Specifically, Dr. Potter accused Sirpal of altering an image and data.  (*See id.* ¶¶ 46(c), (f)–(i)).  Due to these concerns, Dr. Potter withdrew the manuscript from consideration, and the University initiated a research misconduct investigation to examine Sirpal's research methods and conclusions.  (*See id.*).  Sirpal was then placed on a mandatory leave of absence from the Medical School pending the outcome of the research misconduct investigation.  (*See id.* ¶ 46(j)).  The research misconduct investigation, however, was a sham, and the University ignored Sirpal's appeal of his involuntary suspension.  (*See id.* ¶¶ 45, 46(k)).

Dr. Potter and Dr. Pinto were also accused of research misconduct, but the University did not discipline them.  (*See id.* ¶¶ 49(d)–(e)).

Sirpal alleges the University breached its contracts with him.  He alleges "[e]nrollment in the professional school of a university is a [sic] implied-in-fact arrangement for the university to provide the student a professional degree so long as the student complies with the academic and conduct requirements of the university."  (*Id.* ¶ 61).  Some of the terms of those contracts were contained in the University's Handbook, the Medical School Handbook, and the Research Misconduct Policies

and Procedures.  (*See id.* ¶¶ 38–43, 62).  The University promised Sirpal (1) a form of due process, (2) reasonable access to his academic records, and (3) a reasonably prompt and fair investigation into allegations of research misconduct.  (*See id.* ¶ 63).  For example, before the University dismissed Sirpal from the Ph.D. program, he was entitled to an investigation that included an explanation of his rights, a notice of charges, and a range of pleas (*see id.* ¶ 39), but the University failed to do so (*see id.* ¶¶ 46(a)–(b)).  Thus, the University breached its promises to Sirpal.  (*See id.* ¶ 64).

After Sirpal's dismissal and suspension, he applied to several other universities' M.D./Ph.D. programs and "fully disclosed the facts underlying his predicament."  (*Id.* ¶ 113).  Several schools informed Sirpal they would likely admit him as soon as they received his transcripts and a letter from the dean of students.  (*See id.* ¶ 114).  The University of Florida interviewed Sirpal on campus, made a written offer for an M.D./Ph.D. fellowship, and registered him for classes; Tufts University interviewed Sirpal on campus twice and told Sirpal that it would admit him; and three other universities offered Sirpal an interview.  (*See id.*).  The University, however, refused to release Sirpal's transcripts or to send the letter.  (*See id.* ¶ 116).  And after Dr. Potter told a University of Florida official that Sirpal had altered the image in the *JBC* article, the University of Florida withdrew its conditional offer of admission and fellowship.  (*See id.* ¶¶ 52, 118).  But for the University's interference, Sirpal would have transferred to another M.D./Ph.D. program.  (*See id.* ¶ 119).

Defendants move to dismiss nine of Sirpal's twelve counts: violation of 42 U.S.C. § 2000(d) (Count I), violation of 42 U.S.C. § 1981 (Count III), breach of contract (Count II), defamation (Counts VII & IX), tortious interference with a business relationship (Counts VI & X), conversion (Count XI), and negligent bailment (Count XII).

CASE NO. 09-22662-CIV-ALTONAGA/Brown

**B.     Additional Summary Judgment Facts**

Sirpal signed the University's Patent and Copyright Policy Agreement (the "Agreement") on

September 17, 2007.  (*See* Signature Page [D.E. 24-3]).  The Agreement provides as follows:

Ownership of Discoveries and Inventions.

(a) A *discovery* or invention, whether or not subject to patent, developed as a direct
result of the regular duties of a faculty or staff member, or developed by a faculty
member or staff member or student as a result of *research* done on or in connection
with theses or dissertations or problems pertaining thereto, or as a result of a program
of research financed wholly or in part by University funds, or funds under the control
of the University, shall . . . be the exclusive property of the University.

(University of Miami Faculty Manual [D.E. 24-4] at 119 (emphasis added)).  Sirpal did not provide

any opposing evidence that he owns his research or his discovery.  But he did purchase the two three-

ring binders, the jump drive, two folders, and the notebook that he left in Dr. Potter's laboratory.

(*See* Decl. of Sanjeev Sirpal [D.E. 30-1] ¶ 2).  At Dr. Potter's instruction, Sirpal left his research

materials in an unlocked — but lockable — desk in Dr. Potter's lab.  (*See id.* ¶ 3).  Dr. Potter denied

Sirpal's request for secure storage.  (*See id.* ¶ 4).  On March 12, 2008, Dr. Potter told Sirpal the

materials were missing.  (*See id.* ¶ 6).

Defendants move for summary judgment on Sirpal's claims of conversion (Count XI) and

negligent bailment (Count XII).

## II.  LEGAL STANDARDS

**A.     Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading

6

standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). But pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950; *see also Sinaltrainal*, 578 F.3d at 1268 ("[U]nwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of the allegations."). A court's analysis of a Rule 12(b)(6) motion "is limited primarily to the face of the complaint and attachments thereto." *Brooks*, 116 F.3d at 1368.

### B.    Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

CASE NO. 09-22662-CIV-ALTONAGA/Brown

that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The Court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Hayes v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

## III.  ANALYSIS

### A.    Violation of 42 U.S.C. § 2000d Against the University (Count I)

Sirpal alleges the University dismissed him from the Ph.D. program and placed him on an involuntary leave from the Medical School because of his race, in violation of 42 U.S.C. § 2000d. The University argues Sirpal fails to allege discriminatory intent for either his dismissal or his suspension.

Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, "'prohibits discrimination on account of race, color, or national origin in all programs and activities receiving federal financial assistance.'" *Humphrey v. United Parcel Serv.*, 200 F. App'x 950, 952 (11th Cir. 2006) (quoting *Robinson v. Vollert*, 602 F.2d 87, 89 (5th Cir. 1979)). Title VI, which is analyzed under an equal protection framework, *see Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1405 n.11 (11th Cir. 1993), bars only intentional discrimination, *see id.* at 1406. Thus, to state a claim under VI, a plaintiff must allege facts establishing discriminatory intent. *See Carr v. Bd. of Regents of Univ. Sys. of Ga.*, 249 F. App'x 146, 148 (11th Cir. 2007). "Discriminatory intent may be established by evidence of such factors as substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements in the legislative or administrative history of the decision." *Elston*, 997 F.2d at 1406.

1.      Dismissal from the Ph.D. Program

The University argues that although its *employees* may have discriminated against Sirpal, Sirpal fails to allege the *University* intentionally discriminated against him based on race.  Sirpal argues the University discriminated against him by adopting its employees' decisions.

Where a decision-maker acts in accordance with a harasser's decision without herself evaluating the plaintiff's situation, i.e., a cat's paw theory, a plaintiff may establish the decision-maker acted with discriminatory intent.  *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1248–49 (11th Cir. 1998) (recognizing a cat's paw theory in Title VII employment discrimination cases).[1]  Courts have recognized, for example, that an alleged harasser may influence an employer's decision to fire an employee, *see Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1565 (11th Cir. 1987), or that an employer may fail to conduct an independent investigation and thereby act as a conduit for the harasser's discriminatory intent, *see Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996).  In these cases, "the harasser *is* the decisionmaker."  *Llampallas*, 163 F.3d at 1249 (emphasis in original).

Here, Sirpal has pled facts supporting a cat's paw theory of discrimination.  He has alleged (1) Dr. Pinto reacted angrily and in racial terms when Sirpal declined Dr. Pinto's offer to help with Sirpal's research; (2) Dr. Potter tolerated racial taunts such as "terrorist," "Towelhead," and "Habib" from Dr. Pinto; (3) Dr. Pinto falsely accused Sirpal of stealing samples, at which point Dr. Potter "immediately" dismissed Sirpal from the lab, notwithstanding Sirpal denied the allegations; and (4) the University failed to follow its own procedures before dismissing Sirpal from the Ph.D. program.

[1] *Llampallas* is a Title VII case, but the question in Title VI and Title VII cases — did the decision-maker act with discriminatory intent — is the same.  *Cf. Elston*, 997 F.2d at 1406 (Title VI) *and Llampallas*, 163 F.3d at 1245 (Title VII).

If true, these allegations suggest Dr. Pinto acted with discriminatory intent, Dr. Pinto influenced Dr. Potter's and the University's decisions; and Dr. Potter and the University dismissed Sirpal without independent investigation.   And although Sirpal alleges two university officials reviewed the decision to dismiss him from the Ph.D. program, he does not allege facts suggesting the university officials conducted an *independent* review.   Thus, Count I states a claim under Title VI with respect to Sirpal's dismissal from the Ph.D. program.

2.   Involuntary Leave from the Medical School

Sirpal also alleges the University placed him on involuntary leave from the Medical School because of his race.   First, the University suspended him based in part on Dr. Pinto's racially-motivated allegations.   And, second, the University treated Dr. Potter and Dr. Pinto differently from Sirpal: it refused to discipline either non-Indian doctor for allegedly unethical research conduct, but it suspended Sirpal for alleged research misconduct.

Sirpal states a claim under Title VI for this instance of discrimination as well, as the alleged discrimination is based in part on the same cat's paw theory as Sirpal's dismissal from the Ph.D. program.   Although Sirpal alleges the Medical School investigated his research misconduct related to altering data and images, he does not allege the Medical School independently investigated Dr. Pinto's allegations regarding stolen protein samples.   In short, Sirpal alleges the University carried out Dr. Pinto's discriminatory intent when it based its decision to suspend him in part on Dr. Pinto's allegations.   Count I states a claim under Title VI with respect to Sirpal's suspension from the Medical School.

CASE NO. 09-22662-CIV-ALTONAGA/Brown

**B.    Violation of 42 U.S.C. § 1981 Against the University, Dr. Potter and Dr. Pinto (Count III)**

"To state a claim of race discrimination under § 1981, [a] plaintiff[] must allege facts establishing: (1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Jackson v. BellSouth Telecommc'ns*, 372 F.3d 1250, 1270 (11th Cir. 2004).  With respect to the second element, a plaintiff must allege intentional discrimination. *See id.*

Sirpal's section 1981 claim is based on the same facts as his Title VI claim.  (*See Compl.* ¶ 66).  Defendants again argue Sirpal has failed to plead discriminatory intent, but they now argue it is because Sirpal is not similarly situated to his two comparators, Dr. Potter and Dr. Pinto.  (*See Mot.* at 7–9).  However, as discussed above, Sirpal alleges both his dismissal from the Ph.D. program and his suspension from the Medical School are based in part on a cat's paw theory of discrimination: the University credited, without investigating, Dr. Pinto's allegation that Sirpal stole protein samples.  The presence of comparators is irrelevant under this theory.  *See Jackson*, 372 F.3d at 1272–73 (discussing the sufficiency of multiple types of discriminatory intent allegations, only one of which was based on similarly situated individuals); *Ali v. Stetson Univ., Inc.*, 340 F. Supp. 2d 1320, 1324–27 (M.D. Fla. 2004) (noting the difference between a direct evidence case, where the plaintiff alleges blatantly discriminatory remarks, and a circumstantial evidence case, where the plaintiff relies on comparators).  Thus, whether or not Sirpal has sufficiently pled the presence of similarly situated individuals does not dictate whether he has stated a claim.  As above, Sirpal has sufficiently pled discriminatory intent under a cat's paw theory.  Count III states claim.

11

**C.     Breach of Contract Against the University (Count II)**

Sirpal alleges two contracts: one for his Ph.D. and one for his medical degree.

1.     The Ph.D. Contract

The University argues Sirpal fails to state a claim for breach of his Ph.D. contract because "he has not made any allegations that he was denied any contractual rights as to graduate school procedures." (Defs.' Reply ("*Reply*") [D.E. 33] at 4). But Sirpal alleges an implied-in-fact contract with the University, promises of due process rights and access to academic records contained in the University's Handbook, and a breach of those promises when the University dismissed Sirpal from the Ph.D. program. For example, if Sirpal was entitled to an investigation that included an explanation of his rights, a notice of charges, and a range of pleas, and the University failed to comply before it dismissed Sirpal from the Ph.D. program, the University has breached its contract with Sirpal. Count II states a claim for breach of Sirpal's Ph.D. contract.

2.     The Medical School Contract

As to the breach of the Medical School contract, the University argues the Court lacks subject-matter jurisdiction because Sirpal failed to exhaust his administrative remedies: both Sirpal's appeal of his suspension and the research misconduct investigation are ongoing. (*See Mot.* at 6). In response, Sirpal argues the University denied him access to his administrative remedies because (1) it ignored his appeal of the involuntary suspension and (2) the research misconduct investigation is a sham. (*See* Pl.'s Resp. ("*Resp.*") [D.E. 30] at 12–15). Sirpal argues there are no *available* administrative remedies. (*See id.* at 14).

In general, a plaintiff must exhaust his administrative remedies before filing suit, or the court lacks subject-matter jurisdiction. *See, e.g.*, *Gamma Phi Chapter of Sigma Chi Fraternity v. Univ.*

CASE NO. 09-22662-CIV-ALTONAGA/Brown

*of Miami*, 718 So. 2d 910, 910 (Fla. 3d DCA 1998) (holding fraternity must exhaust its administrative remedies as provided in the University's Handbook); *Montalvo v. Univ. of Miami*, 705 So. 2d 1042, 1043 (Fla. 3d DCA 1998) (affirming summary judgment against plaintiff for failure to exhaust administrative remedies because plaintiff did not follow the graduate school's re-examination procedures); *see also Pushkin v. Lombard*, 279 So. 2d 79, 82 (Fla. 3d DCA 1973) (noting exhaustion of administration remedies "goes to the very subject matter jurisdiction of the court"). But a plaintiff need only exhaust *available* administrative remedies. *See Gamma Phi Chapter of Sigma Chi Fraternity*, 718 So. 2d at 910; *Atl. Gas Corp. v. Rec Centers, Inc.*, 305 So. 2d 791, 791 (Fla. 4th DCA 1975). A remedy may be unavailable, and a court will intervene, "where the [administrative] proceedings are not conducted in accordance with the rules, but contrary to law, or where a resort to the internal remedies would be a useless undertaking, would be meaningless or would subject the complainant to unreasonable delay or hardship." *Fla. High Sch. Athletic Ass'n v. Melbourne Cent. Catholic High Sch.*, 867 So. 2d 1281, 1288 (Fla. 5th DCA 2004).

Here, Sirpal alleges the University ignored his appeal, denied him due process, and conducted a sham research misconduct investigation, which suggests that the University did not follow its own procedures and that further resort to internal remedies would be a useless undertaking. *See id.* Moreover, the University wholly failed to address what constitutes an available administrative remedy and whether Sirpal's allegations meet the standard; rather, it simply insists Sirpal must wait. (*See Reply* at 4). Accordingly, at this stage it appears the Court has subject-matter jurisdiction over the alleged breach of the Medical School contract.

13

CASE NO. 09-22662-CIV-ALTONAGA/Brown

**D.     Defamation Against Dr. Potter and the University (Counts VII & IX)**

In Florida, to state a claim for defamation, a plaintiff must allege (1) the defendant published a false statement about the plaintiff to a third party, and (2) the falsity of the statement injured the plaintiff. *See Valencia v. Citibank Int'l*, 728 So. 2d 330, 330 (Fla. 3d DCA 1999). But "a statement made by one having an interest or duty in the subject matter thereof, to another person having a corresponding interest or duty therein, is conditionally privileged, even though the statement may be false and otherwise actionable." *Jarzynka v. St. Thomas Univ. Sch. of Law.*, 310 F. Supp. 2d 1256, 1267 (S.D. Fla. 2004). If a speaker's statements are privileged, a plaintiff must plead express malice. *See id.* at 1268.

1.     Dr. Potter's Statements to the Graduate Committee (Count VII)

Defendants argue that Dr. Potter's statements in the March 12 memo to the Graduate Committee were privileged, and that Sirpal fails to allege express malice. Sirpal does not seriously contend Dr. Potter's statements were not privileged: he alleges they were made within the scope of Dr. Potter's employment to other University employees. The question, then, is whether Sirpal alleges express malice.

Express malice is "ill will, hostility and an evil intention to defame and injure." *Lewis v. Evans*, 406 So. 2d 489, 492 (Fla. 2d DCA 1981). Express malice, however, "cannot be inferred from the fact that some statement are untrue," *Demby v. English*, 667 So. 2d 350, 353 (Fla. 1st DCA 1995), and the privilege is not lost if the speaker merely "feels hostility or ill will toward the plaintiff," *Nodar v. Galbreath*, 462 So. 2d 803, 812 (Fla. 1984). Rather, a plaintiff must show "the speaker used his privileged position 'to gratify his malevolence'" toward the plaintiff. *Id.* at 811 (quoting *Myers v. Hodges*, 44 So. 357, 362 (Fla. 1907)).

Sirpal fails to allege express malice.  Although Sirpal alleges generally that Dr. Potter maliciously made the statements in the March 12 memo, he states no facts that support this allegation.  *See Iqbal*, 129 S. Ct. at 1949 (noting a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  Sirpal argues that Counts VIII and IX contain more specific malicious intent allegations, and because Count VII is "consistent" with Counts VIII and IX, which Defendants did not move to dismiss, Count VII should not be dismissed.  (*See Resp.* at 15).  The problem, however, is that Count VII does not contain or incorporate the more specific allegations in Counts VIII and IX.  Count VII fails to state a claim.

### 2.     Dr. Potter's Statements to the University of Florida (Count IX)

Sirpal alleges Dr. Potter defamed him when Dr. Potter falsely told a University of Florida official that Sirpal had altered the image in the *JBC* article.  Defendants argue that because Sirpal fully disclosed all the facts of his predicament to the University of Florida, the element of third party publication is missing.

Defendants rely on *Valencia*, 728 So. 2d at 330.  In *Valencia* the plaintiff attempted to state a claim for compelled self-defamation: she alleged defamation against her former employer because she was compelled to disclose the false reasons for her termination to prospective employers.  *See id.* at 330.  The Court held the element of third party publication was not satisfied because the former employer never made a statement to prospective employers.  *See id.*

Sirpal's situation is different.  Sirpal does not allege that Dr. Potter committed defamation when *Sirpal* disclosed his situation to the University of Florida, but that Dr. Potter committed defamation when *Dr. Potter* spoke with the University of Florida.  Thus, unlike *Valencia*, an official

CASE NO. 09-22662-CIV-ALTONAGA/Brown

at Sirpal's former university made a statement — a publication — to an official at a prospective university.  Moreover, that Sirpal may have fully disclosed the facts underlying his predicament before Dr. Potter spoke with the University of Florida is irrelevant: each repetition of a defamatory statement is a publication.  *See Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1017 (Fla. 2001).  Count IX states a claim.

### E.   Tortious Interference Against Dr. Pinto, Dr. Potter, and the University (Counts VI & X)

To state a claim for tortious interference with a business relationship, a plaintiff must allege: (1) the existence of a business relationship under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by a third party; and (4) damages to the plaintiff caused by the interference.  *See Sloan v. Sax*, 505 So. 2d 526, 527–28 (Fla. 3d DCA 1987).

#### 1.   Tortious Interference Against Dr. Pinto (Count VI)

Sirpal alleges Dr. Pinto interfered with Sirpal's relationship with the M.D./Ph.D. program by falsely accusing Sirpal of stealing protein samples.  Defendants argue Dr. Pinto's statements were privileged because he was a University employee.  (*See Mot.* a 11).  Sirpal argues that even if Dr. Pinto was a party to Sirpal's relationship with the University, Dr. Pinto's privilege to interfere does not extend to the statements he made solely to carry out his racial bias and seek revenge against Sirpal.  (*See Resp.* at 17).

Sirpal is correct.

[T]he "privilege to interfere" enjoyed by an officer or employee of a contracting party is not absolute.  The privilege is destroyed where an employee acts solely with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business

16

CASE NO. 09-22662-CIV-ALTONAGA/Brown

relationship is not in the employer's best interest.

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999).

Sirpal alleges Dr. Pinto acted solely to carry out his racial bias and seek revenge against Sirpal, thus

defeating Dr. Pinto's claim of privilege.  Although Dr. Pinto maintains he had an honest belief Sirpal

stole the protein samples (*see Reply* at 8), whether his belief was honest is a merits question.  Count

VI states a claim.

### 2.    Tortious Interference Against Dr. Potter and the University (Count X)

Sirpal alleges Dr. Potter and the University interfered with his relationship with prospective

universities.  Defendants argue Sirpal fails to plead a protected business relationship with any of the

prospective universities because he had nothing more than an offer of admission.

To state a claim for tortious interference with a business relationship, a plaintiff need not

plead an enforceable contract, but "the alleged business relationship must afford the plaintiff existing

or prospective legal or contractual rights."  *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.

2d 812, 814 (Fla. 1994) (internal quotation marks omitted).  Although a mere offer to sell is

insufficient to state a claim, *see id.*, "an action . . . will lie if the parties' understanding would have

been completed if the defendant had not interfered," *Charles Wallace Co., Inc. v. Alternative Copier

Concepts, Inc.*, 583 So. 2d 396, 397 (Fla. 2d DCA 1991).  For example, where negotiations

progressed beyond a mere offer to an understanding between the parties for the sale of a business,

a protected business relationship existed.  *See Landry v. Hornstein*, 462 So. 2d 844, 846 (Fla. 3d

DCA 1985).

Similarly here, Sirpal alleges the University of Florida interviewed him and made him a

written offer to join its M.D./Ph.D. program, and Tufts conducted two days of interviews and told

17

him it would admit him.  Sirpal alleges more than a mere offer — he alleges two universities vetted him through an interview process and told him they would admit him, much like the negotiations in *Landry*.  He also alleges that but for Defendants' interference, he would have been admitted to another university.  These allegations are sufficient to state a claim.

Defendants also argue that because Sirpal fully disclosed his predicament to the University of Florida, the University of Florida would have been aware of the misconduct allegations, and Dr. Potter's statement to a University of Florida official did not matter.  In essence, Defendants argue the University of Florida did not truly rely on Dr. Potter's statements.  This argument fails for two reasons.  First, whether Dr. Potter's statements influenced the University of Florida is a merits question; at this stage Sirpal need only plead the elements of his claim.  Second, Sirpal also alleges the University interfered by failing to send his transcripts and a letter from the dean.  Count X states a claim.

**F.      Conversion Against the University (Count XI)**

The University moves to dismiss Sirpal's conversion claim, or, in the alterative, for summary judgment, arguing Sirpal is not the true owner of his research and discovery.

"Conversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'"  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (quoting *Thomas v. Hertz Corp.*, 890 So. 2d 448, 449 (Fla. 3d DCA 2004)).  A plaintiff must allege he has the right of possession in the property allegedly converted.  *See Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1294 (S.D. Fla. 2001).  Thus, before a defendant may be held guilty of conversion, the plaintiff must show the defendant "exercised a positive, overt act or acts of dominion or authority over the money or property inconsistent with and adverse to the

CASE NO. 09-22662-CIV-ALTONAGA/Brown

rights of the true owner." *Armored Car Serv., Inc. v. First Nat'l Bank of Miami*, 114 So. 2d 431, 434 (Fla. 3d DCA 1959).

As to the University's Motion to Dismiss Count XI, Sirpal states a claim for conversion. Sirpal has alleged he owned property (personal items and research), he left it in Dr. Potter's laboratory, and the University wrongfully converted that property to its own use. Count XI states a claim.

As to the University's Motion for Summary Judgment, partial summary judgment is appropriate. Under the University's Patent and Copyright Policy Agreement, the University owns Sirpal's protein research and his discovery. Although Sirpal submitted an affidavit stating he purchased the two three-ring binders, the jump drive, two folders, and the laboratory notebook, he did not provide any opposing evidence that he owns his research or his discovery.

Sirpal argues that "[w]hile the ownership of intellectual property involved *may* in the future impact [his] recovery of damages . . . [that issue] is not before the court at this juncture." (*See Resp.* at 19). The University's Motion, however, put the issue before the Court, and Sirpal has failed to oppose the Motion to the extent it seeks summary judgment regarding conversion of Sirpal's research and his discovery. Under Rule 56(e)(2), FED. R. CIV. P., Sirpal has failed to satisfy his obligation to respond to the Motion, and partial summary judgment is appropriate.

The University raises a second argument that Sirpal similarly fails to address. The University argues Sirpal's alleged copyright on the *JBC* article fails to confer ownership in the underlying research or discovery because "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b). The Court agrees. "[I]deas are substantively and categorically

excluded from *the subject matter* of copyright." *Dunlap v. G&L Holding Group, Inc.*, 381 F.3d 1285, 1296 (11th Cir. 2004). Sirpal cannot rely on his copyright of the *JBC* article to confer ownership over the underlying intellectual property.

Thus, to the extent Count XI seeks relief for conversion of Sirpal's research and his discovery, summary judgment is granted to Defendants. Sirpal has, however, provided evidence that he owns the materials he purchased. To the extent he seeks relief for conversion of those materials, summary judgment on Count XI is denied.

**G.      Negligent Bailment Against the University and Dr. Potter (Count XII)**

Sirpal's negligent bailment claim is based on the same facts as his claim for conversion, and the parties raise the same arguments regarding Sirpal's ownership of the property. A bailment "is generally a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the owner." *S & W Air Vac Sys., Inc. v. Dep't of Revenue*, 697 So. 2d 1313, 1315 (Fla. 5th DCA 1997). Accordingly, bailment "requires an owner of the object (the bailor) and the possessor (the bailee)." *Meeks ex rel. Estate of Meeks v. Fla. Power & Light Co.*, 816 So. 2d 1125, 1129 n.4 (Fla. 5th DCA 2002).

Again, although Sirpal has stated a claim for negligent bailment, partial summary judgment is appropriate. Sirpal alleges he owned certain property, he left it in Dr. Potter's laboratory at Dr. Potter's request, and the property is now missing because Dr. Potter failed to provide Sirpal secure storage. But, as with Sirpal's claim for conversion, the University presented uncontroverted evidence that Sirpal does not own his research or his discovery; and the copyright laws do not confer ownership over the intellectual property underlying Sirpal's *JBC* article. Thus, to the extent Count XII seeks relief for negligent bailment of Sirpal's research and his discovery, summary judgment is

20

CASE NO. 09-22662-CIV-ALTONAGA/Brown

granted.  Sirpal may pursue his claim for negligent bailment to the extent he seeks relief for the personal items he purchased.

## IV.  CONCLUSION

Consistent with the foregoing analysis, it is

**ORDERED AND ADJUDGED** as follows:

1.  Defendants' Motion to Dismiss **[D.E. 24]** is **GRANTED IN PART** and **DENIED IN PART**.

2.  Count VII is **DISMISSED** without prejudice for failure to state a claim.

3.  Defendants' Motion for Summary Judgment **[D.E. 26]** is **GRANTED IN PART** and **DENIED IN PART**.

4.  The University is awarded partial summary judgment on Count XI, to the extent Sirpal seeks relief for conversion of his research and discovery.

5.  The University and Dr. Potter are awarded partial summary judgment on Count XII, to the extent Sirpal seeks relief for negligent bailment of his research and discovery.

6.   Sirpal has until February 5, 2010 to amend Count VII by filing an amended complaint.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of January, 2010.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

21