09-22662.og3

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 09-22662-CIV-BROWN

SANJEEV SIRPAL,

      Plaintiff,

vs.

UNIVERSITY OF MIAMI, a Florida not
for profit corporation, JAMES D. POTTER, Ph.D.,
JOSE RENATO PINTO, Ph.D., and CLAUDIA
RODRIGUES, Ph.D.,

      Defendants.

_____/

## ORDER ON MOTION FOR FINAL SUMMARY JUDGMENT

**This matter** is before this Court on Defendants' Motion for Final Summary Judgment (D.E. 91). The Court has considered the motion, the response, the reply, the supplemental filings, and all pertinent materials in the file. In addition, a hearing was held on June 16, 2011at which argument of counsel was considered on certain issues. The Court adopts the transcript of that hearing by reference herein.

### FACTS

Plaintiff Sanjeev Sirpal ("Sirpal"), an Indian-American, commenced as an M.D./Ph.D. student in 2005 in the University of Miami's ("UM") Graduate School ("Graduate School") and the Miller School of Medicine ("Medical School") in the Molecular and Cellular Pharmacology Program ("MCP").

1

## I.  Plaintiff's dismissal from the Ph.D. Program

Sirpal served a rotation in Dr. Nanette Bishopric's lab in early 2007.  Each professor who runs a laboratory in the MCP has complete discretion over which Ph.D. students are permitted to join or maintain a position within his or her laboratory.  Bixby Dec. ¶4.  Defendant Dr. Claudia Rodrigues ("Dr. Rodrigues") was a Brazilian post-doctorate fellow who worked with Sirpal in the lab. Dr. Rodrigues testified that after she received an email from Sirpal regarding an email she had sent to Dr. Bishopric concerning some data which she believed Sirpal had misrepresented in a lab meeting, she advised Dr. Bishopric that she was not "comfortable" working with Sirpal, and found his behavior to be "aggressive." Rodrigues Dep. pp. 48-55; 58-59.

Sirpal subsequently joined the lab of Defendant James D. Potter, Ph.D ("Dr. Potter"), Chair of the Department of Molecular and Cellular Pharmacology, where he worked with Defendant Jose Renato Pinto ("Dr. Pinto") a Brazilian post-doctorate fellow, and Michelle Jones, the lab manager. In June, 2007, Sirpal rejected a request from Dr. Pinto to be included on a paper which was being co-authored by Sirpal and Dr. Potter.

On September 6, 2007, Dr. Rodrigues sent an email to Dr. Richard J. Bookman, UM's Vice Provost for Research and Associate Professor in the MPC lab, informing him that some unidentified person had improperly accessed her University email account and sent emails from her account to her grant administrator, falsely stating that she was resigning from her grant. Bookman Dec. ¶4, Ex. A; Rodrigues Dep. p. 62.  On September 14, 2007, during a Medical School Security Department investigation, University Security Officer Lee Michaud interviewed Dr. Rodrigues, who named Sirpal when asked "to name anyone who (sic) she had recently had problems with."  Rodrigues Dep. pp. 123-124, Ex. 18. Sirpal was charged with an Honor Code offense, of which he was subsequently acquitted. Sirpal Decl. ¶6.

In early March, 2008, Dr. Pinto and Ms. Jones advised Dr. Potter that they believed that Sirpal had taken and was using their research samples without their permission.  After Dr. Potter

instructed them that he was unwilling to believe them without "evidence," (Potter Dep. p. 55), on March 3, 2008, Dr. Potter held a lab meeting with Sirpal, Dr. Pinto, Ms. Jones, and several others, where Sirpal was confronted with pictures taken by Dr. Pinto and Ms. Jones, allegedly showing those research samples in Sirpal's freezer box, with labels allegedly in Sirpal's handwriting.  Potter Dec. ¶8[1]; Jones Dec. ¶¶ 18-19, Pinto Dec. ¶12.  Sirpal denied that he took the samples and had no explanation for how they got into his freezer box.  Potter Dep. p. 71; Potter Dec. ¶ 8.

Following the meeting, Dr. Potter made the decision to dismiss Sirpal from his lab, reported his decision and the incident to Dr. Kerry Burnstein, the MCP Graduate Program Director, and informed Sirpal of this on March 4, 2008.  Potter Dec. ¶9, Ex. A.

The Policies and Procedures of the Graduate School (of which all Ph.D. Programs were a part) for the period in question are contained within the University of Miami Bulletin, 2007-2008 ("Bulletin"), in the section entitled "Graduate School," which states, *inter alia*, as follows:

> All graduate students are bound by the rules and regulations of the University of Miami that apply to them.
>
> Two types of disciplinary procedures exist: Academic and Nonacademic. Procedures for handling disciplinary and grievance matters are well established.  Further information may be obtained from the Office of the Graduate School.

Bixby Decl., Ex. A, p. 364.  Although it was not presented in written form during 2007-2008, Dr. Bixby described the Graduate School's procedure for a student accused of misconduct or unethical behavior during that time as follows:

> If the Graduate Program Director determines that the department's Graduate Program needs to take action, a Graduate Committee is convened to investigate the matter and make a recommendation as to what action, if any, needs to take place.  Any decision rendered by the department's Graduate Committee may be appealed to the Graduate School administration.

---

[1]In his Response, Sirpal noted that Dr. Potter's Declaration, which Defendants cited in support of certain undisputed facts, had not been filed with the Court.  Defendants subsequently filed Dr. Potter's Declaration with their Reply.

Id. at ¶6.[2]  The Bulletin further provides:

> To preserve its ideals of scholarship, conduct, and character the Graduate School reserves the right and the student by his/her registration concedes the right to require the withdrawal of any student for any reason deemed sufficient by the Graduate School at any time.

Bixby Decl., Ex. A, p. 356.

A Graduate Committee, composed of Dr. Burnstein and two other MCP faculty members, conducted a hearing on March 19, 2008 to review the allegations of misconduct against Sirpal. Potter Decl. ¶ 10, Bixby Decl. ¶ 9; Sirpal Dep. vol. I, p. 73. Prior to the hearing, Sirpal responded to the allegations with an email to Dr. Burnstein (Sirpal Dep. p. 71), and Dr. Potter submitted a written memorandum to the Graduate Committee, summarizing his reasons for dismissing Sirpal from his lab.  Potter Dec. ¶10, Ex. B.

At the hearing, the Graduate Committee heard only from Sirpal, who denied the allegations against him and suggested that Dr. Pinto had framed him because of the research paper incident. Burnstein Dep. p. 46, 56-57; Sirpal Dec. ¶ 17.  On March 20, 2008, the Graduate Committee rendered its decision to dismiss Sirpal from the M.D./Ph.D. Graduate Program, and he was given written notification.  Sirpal Dep. vol. I, p. 81-82.  On March 28, 2008, after meeting with Dr. John Bixby, Assoc. Dean for Graduate Studies for the Medical School, Sirpal submitted his written appeal of the Graduate Committee's decision.  Bixby Dec. ¶13, Ex. D.

Dr. Bixby conducted a secondary investigation into the matter by reviewing all of the documents from the Graduate Committee, as well as Plaintiff's letter of appeal.  Bixby Dec. ¶ 14. Dr. Bixby met with the Graduate Committee members to discuss their decision and the procedures afforded Sirpal during the investigation, as well as with Mr. Michaud, who provided him with the Security Report he had prepared at the conclusion of his investigation regarding Dr. Rodrigues's email.  Dr. Bixby also met with Sirpal for over an hour and thirty minutes,  met with Ms. Jones, and

---

[2]In 2009, this procedure was formalized in writing in the MCP Handbook.  Bixby 30(b)(6) Dep. pp. 9-10.

spoke to Dr. Potter. Bixby Dec. ¶¶ 15-19.

Dr. Bixby ultimately upheld Sirpal's dismissal, finding that the evidence supported the Graduate Committee's decision to dismiss him and that the Graduate Program had followed its own internal procedures correctly. Sirpal was given written notification of Dr. Bixby's decision on April 30, 2008. Bixby Dec. ¶ 20, Ex. J.

Sirpal appealed Dr. Bixby's decision to the Dean of the Graduate School, Dr. Teresa Scandura, who convened a Graduate Student Appeals Committee ("Appeals Committee") on behalf of the Graduate School on May 22, 2008. Bixby Dec. ¶23. After a review, the Appeals Committee, as well as Dr. Scandura, found that the Graduate Program had acted within its purview and upheld the decision of dismissal. Bixby Dec. ¶¶ 23-24; Sirpal Dep. vol. I, pp. 106-107, Ex. 8. At that time, Sirpal's dismissal from the Ph.D. Program was final and he had exhausted all of his appellate rights within the Graduate School. Bixby Dec. ¶24.

The procedure to which Sirpal was subjected by the Graduate School has been applied to "lots of people" for academic dismissals and was applied once to a non-academic dismissal fifteen years prior. Bixby 30(b)(6) Dep. pp. 39-40.[3]

## II.  Plaintiff's Dismissal from the Medical School

Sirpal and Dr. Potter coauthored a research paper that was published in an online Journal on January 31, 2008 ("the Article"). After a prior fellow advised Dr. Potter that he believed that some of the information in the Article was inaccurate, on March 7, 2008, Dr. Potter emailed Sirpal to ask him to supply the raw data that supported the Article. After Sirpal could not supply the original raw data in support of the Article, on April 3, 2008 Dr. Potter withdrew the Article from publication.

On March 24, 2008, Dr. Robert Hernandez, Senior Associate Dean for Medical Student Administration for the Medical School, put a "hold" on Sirpal's medical school transcript, and subsequently, his graduate school transcript, due to the accusations surrounding his dismissal from

---

[3]Dr. Bixby described non-academic dismissals as "rare." Bixby 30(b)(6) Dep. pp. 39-40.

the Graduate School, the questions concerning the Article, and the allegations concerning Dr. Rodrigues's email account. Bookman Dec. ¶10, Ex. D; Hernandez Dec. ¶10.

On March 27, 2008, Dr. Bookman initiated a scientific misconduct investigation concerning the missing research data. On April 16, 2008, Dr. Bookman sent Sirpal and Dr. Potter a Charge Letter which informed them that a Preliminary Investigative Committee (PIC), was being formed to determine whether there were sufficient grounds to warrant a full investigation into the validity of some of the experiments that were reported in the Article, and specifically the possibility that an image had been manipulated. Kroll, Inc., a forensic examining company, was retained by UM and conducted an investigation.

While that investigation was pending, on May 29, 2008, Dr. Hernandez advised Sirpal that he was aware of Sirpal's dismissal from the Graduate School, and that the medical education administration ("MEA") (Dr. Hernandez and two other faculty members)would undertake its own investigation to determine if any actions would be warranted on the Medical School's part. On June 10 and July 14, 2008, Sirpal met with the MEA. On June 13, 2008, Sirpal submitted a written summary of the allegations against him and submitted additional information on June 23, 2008.

On July 28, 2008, Dr. Hernandez informed Sirpal in writing that the MEA had decided to defer making a formal decision regarding his standing in the Medical School, and his petition to resume his medical training in the M.D. program, until the conclusion of the scientific research investigation. Sirpal was told that at that time he could petition for reinstatement. In the interim, Sirpal was to remain on a mandatory leave of absence. Hernandez Dec. ¶22, Ex. I. Sirpal appealed the mandatory leave of absence to Dean Goldschmidt, Dean of the Medical School. Sirpal Dep. vol. I p. 147.

The Final PIC Report on the research misconduct investigation, which unanimously recommended that a full investigation was warranted and both Sirpal and Dr. Potter be named as Respondents, was delivered to Dr. Bookman on August 7, 2008.

A Full Investigative Committee ("FIC") was impaneled and interviewed Sirpal, Dr. Potter, Dr. Pinto and Dr. Jiang-Sheng Liang, Ph.D. Additionally, Sirpal submitted written responses to the information collected by Kroll, and the memorandum of his interview. Sirpal also submitted a written response to the FIC's Draft Report, which was provided to him on October 6, 2009.

On September 8, 2009, Plaintiff filed the complaint in this case, which alleged, *inter alia*, intentional discrimination with respect to his expulsion from the Ph.D. Program and his leave of absence from the Medical School. Plaintiff's appeal to Dean Goldschmidt regarding his leave of absence remained pending as of January 27, 2010, when Sirpal filed his Second Amended Complaint, which again challenged his expulsion from the Ph.D. Program and his leave of absence from the Medical School.[4]

---

[4]On May 20, 2010, the FIC issued its Final Report, in which it concluded that scientific research misconduct had occurred, but it was unable to make a determination as to who had committed it. On July 28, 2010, Sirpal's mandatory leave of absence expired, and on August 5, 2010, Sirpal submitted a petition for reinstatement to the Medical School, raising claims of racial discrimination. Hernandez Dec. ¶28.

The MEA met with Sirpal on August 27, 2010, where, in addition to the discrimination allegation, they also discussed the results of a July 26, 2010 Metadata Examination prepared by an expert retained by UM, which concluded that a photograph in the Article had been modified with an Adobe Photoshop software package licensed to "kakars", which is Sirpal's mother's e-mail name. Sirpal denied that he or his mother owned Adobe Photoshop software. At the conclusion of the meeting, Dr. Hernandez requested that Sirpal submit a written explanation of why his mother's name was on the software and why he never informed the administration about being subject to ethnic slurs. Id. at ¶¶ 30-31. On August 28, 2010, Sirpal sent an email to the MEA on August 27, 2010 but did not address these issues. Id. at ¶32.

On November 11, 2010, after performing additional investigation, the MEA advised Plaintiff that his petition for reinstatement was denied, and the MEA was recommending his dismissal from the Medical School for unprofessional conduct, finding that Sirpal took the research samples without permission and that Sirpal was not honest regarding several aspects of that case; that Sirpal had altered the image in the Article; that Sirpal was the person responsible for hacking into Dr. Rodrigues's computer; and that Sirpal's complaints of discrimination were uncorroborated. Id. at ¶28, ¶¶33-37. Sirpal appealed that decision to the Executive Promotions Committee ("EPC"), which, after investigation, voted to accept the MEA's recommendations. On January 11, 2011, Sirpal appealed that decision to the Dean of the Medical School. Id. at ¶¶ 39-43.

### III.  Sirpal's allegations of discrimination

Sirpal testified that after he rejected Dr. Pinto's request to be included in the research paper, Dr. Pinto responded by stating "You Indians are so smart. All you know how to do is to publish. I'm a post doc and I don't have any publications." Sirpal further testified that shortly after that, Dr. Pinto referred to him at every interaction and in lab meetings, as "a terrorist," a "bearded towel head," "raghead" and "Habib," and that in September, 2007, Dr. Pinto stated: "You terrorist, I'm going to get you. You're not going to last long." Sirpal Dep. vol. II, pp. 235 - 237, 240-41. Sirpal maintained that the racial taunts "were heard by everyone in the lab" including Dr. Potter, Ms. Jones, Dr. Danuta Szczesna-Cordary, Dr. Jing-Sheng Liang and possibly two other members of the lab. Id. at 250-251.

Plaintiff also testified that Ms. Jones called him  "a terrorist," a "towel head," and "Habib," as did fellow student David Dweck "many times," (id. at 240-41), and that at a lab meeting in September, 2007 Dr. Rodrigues referred to him as a "towel head who has a superiority complex, who has a problem working with women" in Dr. Potter's presence. Sirpal Dep. vol. II, pp.237, 241. Plaintiff also believes that in addition to Dr. Potter, Dr. Pinto and Ms. Jones, Dr. Danuta Szczesna-Cordary, and Dr. Michelle Parvatiyar were present at that time. Id. at 243.

Sirpal testified that he complained numerous times about the racial insults to Dr. Potter, who "would dismiss them and basically say they're just jokes," until finally at a meeting on February 29, 2008 he told Dr. Potter that he if did not address the situation, Sirpal would "go through appropriate University channels ... and involve people outside of the lab," (id. at 238), or would possibly "have to transfer to another lab." Id. at 252. Sirpal also testified that on March 3, 2008, he told Dr. Bixby about the racial taunts, but Dr. Bixby "warned [Sirpal] not to repeat these allegations to anyone else, because [Sirpal] would be seen in a bad light by UM officials and it would only make [his] standing worse at UM." Sirpal Dec. ¶ 7.

Sirpal has also submitted inadmissible double hearsay in the form of his testimony that "in

8

2010, while standing in the hallway outside one of my hearings for reinstatement to medical school, I overheard [Assoc. Dean] Robert Hernandez ... tell the two other members of the [MEA] that a professor had confirmed that I had complained to him about racial epithets, and that UM would have settled the case long ago, had I not made these discrimination complaints."[5] Sirpal Dec. ¶7.[6]

## IV. Plaintiffs' applications to other schools

After he was dismissed from Dr. Potter's lab, Sirpal sought to transfer to the M.D./Ph.D. program at the University of Florida ("UF"). Sirpal advised Dr. Hsu, UF's co-director of the M.D./Ph.D. program of his dismissal from Dr. Potter's lab and that UM would not release his transcripts. On April 25, 2008, Sirpal was given a conditional offer of acceptance by UF, subject to Sirpal's being able to provide a final transcript and letter of good standing from the Medical School.

On July 7, 2008, Dr. Wayne McCormack, the other co-director of UF's M.D./Ph.D. program called Dr. Potter after he learned that the Article had been withdrawn. Up until that time, Sirpal had not advised that he had been dismissed from the Ph.D. Program or about the research misconduct investigation. McCormack Dep. p. 18. Dr. Potter states that he "informed Dr. McCormack that I could not comment on Sirpal and his situation at the University," and "did not provide Dr. McCormack with any information regarding Sirpal." Potter Dec. ¶ 19. Dr. McCormack testified that

---

[5] In Saunders v. Emory Healthcare, Inc., 360 Fed.Appx. 110 (11th Cir. 2010), cert. denied, 131 S. Ct. 1473 (2011), the Court stated that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Id. at 112 (citing Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999) (internal quotation marks omitted)). Sirpal has failed to demonstrate that the Dean or any professor will testify as to the truth of this statement.

[6] Dr. Hernandez, Dr. Bixby, Dr. Potter, Dr. Pinto, Ms. Jones and Mr. Dweck all deny making or hearing any racial taunts. (Hernandez Dec. ¶¶ 35,37; Bixby Dec. ¶25; Potter Dec. ¶¶ 17-18; Pinto Dec. ¶¶ 17-19; Jones Dec. ¶¶ 8-10; Dweck Dec. ¶6-8). Additionally, Dr. Parvatiyar, Dr.Szczesna-Cordary, Dr. Jing-Sheng Liang and another lab worker, Zorida Diaz-Perez, also deny ever making or hearing any racial taunts being made to Sirpal or having heard Sirpal complain of same. Parvatiyar Dep. pp. 22-23; Szczesna-Cordary Dec. ¶8; Jing-Sheng Liang Dec. ¶¶ 11-12; Diaz-Perez Dec. ¶28. No admissible evidence has been offered that corroborates plaintiff's claims.

Dr. Potter "began to talk about the postdoc incident, but then he also mentioned something about some concern about some of the data in the paper" and responded in the affirmative when Dr. McCormack asked him whether there had been "an allegation made about research misconduct on the part of Mr. Sirpal." McCormack Dep. pp. 26-27. UF subsequently rescinded its acceptance.

Sirpal also applied to transfer to Tufts University School of Medicine. Sirpal testified that he received a verbal offer of acceptance into the M.D./Ph.D. Program. Sirpal Decl. ¶ 19. The school deferred Sirpal's application until after the completion of the research misconduct investigation.

### V.  University and Medical School Policies and Procedures

The University's 2007-2008 Rights and Responsibilities Student Handbook ("UM Handbook"), states that the procedures therein apply to both graduate and undergraduate students, but that "[s]tudents are also subject to rules and regulations that apply to academic programs of the various academic schools and colleges, including but not limited to, the Undergraduate and Graduate Honor Codes." Scandura Dep., Ex. 1, p. 3. The UM Handbook further provides that a student who violates the University Code of Conduct "may be charged" under the "University Disciplinary Procedures" or the "Major Disciplinary Procedures." Id. at 72, 78.

The rights and responsibilities of medical students are contained in the University of Miami Miller School of Medicine 2007-2008 Medical Student Rights and Responsibilities Handbook ("Medical Student Handbook"). Hernandez Dec., Ex. A. The section entitled "Academic Policies and Procedures" " defines "the mechanisms for disciplinary actions and the appeals process." Id. at 10.

The "Medical Student Conduct and Academic Integrity" subsection includes a description of two peer review programs. The Physicianship and Professionalism Advocacy Program ("PPAP"), "provides a formal mechanism to advise and support students in their professional conduct and

10

behavior."[7] Id., Appx. 1. The Code of Honorable and Professional Conduct ("Code"), governed by the Council for Honorable and Professional Conduct ("CHPC"), provides, *inter alia*, that "[a]n investigation by the CHPC will not preclude simultaneous or additional investigation or possible action by the administration." Id. at 10; Appx. 2. It further provides that:

> In addition to the policies and procedures described in the Code, the faculty and administration reserves the right to investigate cases in which students are suspected of academic dishonesty, or unethical/unprofessional conduct either inside or outside the UMMSM. The faculty promotions committees and the administration reserve the right to make recommendations or impose sanctions, while taking into account any findings and recommendations of the [CHPC] into consideration, as deemed appropriate. Students may appeal such recommendations and sanctions to the Dean of the School of Medicine.

Id. at 11.

The "Extended Enrollment/Leave of Absence" subsection of the Medical Student Handbook states, in pertinent part, as follows:

> **MANDATORY LEAVE**
>
> A leave of absence for disciplinary reasons [not to exceed two years] can be recommended by ... the medical education administration for professional misconduct or other reasons. In all instances, decisions regarding leave and the conditions under which a student may petition for return to the University of Miami Miller School of Medicine will be provided in writing by the administration. The student has the right to appeal a recommendation for a mandatory leave of absence to the Dean of the University of Miami Medical School.

Id. at 24.

## DISCUSSION

In the Second Amended Complaint, ("SAC")Plaintiff has sued the University, Dr. Potter, Dr.

---

[7]The PPAP provides that "[r]ecommendations for disciplinary actions against a medical student because of a violation of a rule of conduct or inappropriate behavior may be made by a class promotions committee, the [CHPC], or the medical school administration Associate Dean for Student Affairs... ", and that "[d]isciplinary actions resulting from deficiencies in professional behavior can be initiated by a course coordinator, the class promotions committees, the [CHPC] or the medical school's ADSA." Hernandez Dec., Ex. A at 49.

Pinto and Dr. Rodrigues as follows:

Count I - Violation of Title VI of the Civil Rights Act of 1964 (Def. UM)

Count II - Breach of Contract (Def. UM)

Count III - Violation of 42 U.S.C. § 1981 (Def. UM, Def. Potter, Def. Pinto)

Count IV - Defamation (Def. Rodrigues)

Count V - Defamation (Def. Pinto)

Count VI - Tortious Interference (Def. Pinto)

Count VII - Defamation (Def. Potter re: Pinto allegations)

Count VIII - Defamation (Def. Potter and Def. UM re: statements to PIC)

Count IX - Defamation (Def. Potter, UM re: statements to UF)

Count X - Tortious Interference (Def. Potter, Def. UM)

Defendants move for summary judgment on all counts.

## I. Standard on Motion for Summary Judgment

The purpose of summary judgment is "to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee's note). Summary judgment is proper only when no genuine dispute as to any material fact exists and the moving party is entitled to a judgment as a matter of law. H&R Block Eastern Enterprises, Inc. v. Morris, 606 F.3d 1285, 1290 (11th Cir. 2010); Fed.R.Civ.P. 56.[8]

The moving party bears the initial burden of explaining to the Court the basis for the motion and identifying those portions of the record that demonstrate that there is no genuine dispute of material fact. Allen v. Board of Public Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007). Thus the movant must either show that the nonmoving party has no evidence to support its

---

[8] An issue of fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

case, or present "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991); Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004). However, the Court must view all of the evidence in the light most favorable to the nonmoving party, with all reasonable inferences also being drawn in the nonmovant's favor. Info. Sys.& Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002); Siemens Power Transmission & Distribution, Inc. v. Norfolk Southern Railway Co., 420 F.3d 1243, 1248 (11th Cir. 2005). If the movant is able to demonstrate either of the aforementioned requirements, the burden shifts to the nonmoving party to show that a genuine dispute remains for trial. Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010).

A genuine dispute as to material fact exists only when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Allen, 495 F.3d at 1313; Hickson Corp., 357 F.3d at 1260. Where a reasonable fact finder may "draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion." Doe v. School Bd. of Broward County, Fla., 604 F.3d 1248, 1254 (11th Cir. 2010) (quoting Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)). However, if the facts and inferences overwhelmingly favor one side, such that a reasonable jury could only arrive at one verdict, then summary judgment must be granted as a matter of law. Williams v. Dresser Indus., Inc., 120 F.3d 1163, 1167 (11th Cir. 1997); Bishop v. City of Birmingham Police Dept., 361 F.3d 607, 609 (11th Cir. 2004). For the non-movant to survive such a grant, there must be more than a mere scintilla of evidence. Williams, 120 F.3d at 1167.

## II. Count I and Count III - Discrimination

In Count I, Sirpal alleges that UM's practices towards him, specifically dismissing him from the M.D./Ph.D. program and placing him on an involuntary leave from Medical School violated his

rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., which prohibits racial discrimination in a federally funded program. In Count III, Sirpal alleges a violation of 42 U.S.C. § 1981,which prohibits racial discrimination in connection with making and enforcing of contracts, against UM, Dr. Potter and Dr. Pinto, specifically related to his implied-in-fact contract with UM to provide him a professional education through its M.D./Ph.D. sequence. Sirpal requests a declaratory judgment that UM's practices violated the Act, and requests injunctive relief through reinstatement in the M.D. and Ph.D. Programs at the Medical School, as well as damages.[9]

Title VI claims are analyzed in the same manner as claims brought under Title VII. See Butler v. Ala. Dept. of Transp., 536 F.3d 1209, 1215 (11th Cir. 2008). In order to prove intentional discrimination under Title VII (and, accordingly, Title VI), a plaintiff must show that the defendant (1) intended to discriminate against the plaintiff based on a protected characteristic, (2) the plaintiff suffered an adverse action and (3) there is a causal link between the two. See Llampallas v. Mini-Circuits Lab, Inc., 163 F.3d 1236, 1245-46 (11th Cir. 1998), cert. denied, 528 U.S. 930 (1999).

Similarly, "[t]o state a claim of race discrimination under § 1981, [a] plaintiff[] must allege

---

[9]As an initial matter, the Court finds that Sirpal's claim for injunctive relief based on the actions of UM which resulted in his dismissal from the Ph.D. Program and his leave of absence from the Medical School has been rendered moot by the subsequent event of Sirpal's dismissal from the Medical School, which Sirpal has not challenged in the SAC. See Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1183 (11th Cir. 2007) ("If events that occur subsequent to the filing of a lawsuit ... deprive the court of the ability to give the plaintiff ... meaningful relief, then the case is moot and must be dismissed.")(quoting Trojano v. Supervisor. of Elections., 382 F.3d 1276, 1281-82 (11th Cir. 2004) (omissions in original). In order to be entitled to injunctive relief, a plaintiff must show: (1) success on the merits; (2) continuing irreparable injury; and (3) no adequate remedy at law." Kenner v. Convergys Corp., 342 F.3d 1264, 1269 (11th Cir. 2003). Because Sirpal has been dismissed from the Medical School he cannot show an irreparable injury or an inadequate remedy at law based on the violations alleged in the SAC. When the issue of mootness was raised at the June 16 hearing, Sirpal's counsel argued that the issue of the propriety of Sirpal's dismissal from the Medical School should be considered as part of the case because it had been "tried by consent," a claim that was vehemently contested by defense counsel. The Court noted at the hearing that merely because discovery has been taken on an issue does not render it having been "tried" by consent. Sirpal has made no subsequent attempt to amend the SAC.

14

facts establishing: (1) he is a member of a racial minority; (2) the defendant intended to racially discriminate against him; and (3) the discrimination concerned one of more of the activities enumerated in the statute." Jiminez v. Wellstar Health System, 596 F.3d 1304, 1308 (11th Cir. 2010). Where an Equal Protection violation is alleged along with a §1981 violation, both claims are analyzed under the Title VII analysis. See Bryant v. Jones, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009), cert. denied, 130 S. Ct. 1536 (2010); see also Vega v. INVSCO Group, Ltd., No. 10-11722, 2011 WL 2533755, at *2 (11th Cir. June 24, 2011).

In order to establish intent, a plaintiff may proceed by direct or circumstantial evidence. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Direct evidence is "evidence that, if believed, proves [the] existence of [a] fact without inference or presumption." Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005) (quoting Wilson, 376 F.3d at 1086); see also Standard v. A.B.E.L. Svcs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (applying definition in ADA case). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence." Kilpatrick v. Tyson Foods, Inc., 268 Fed.Appx. 860, 862 (11th Cir. 2008) (citing Wilson, 376 F.3d at 1086). Moreover, "remarks by non-decisionmakers ... are not direct evidence of discrimination." Standard, 161 F.3d at 1330; see also Mehta v. HCA Health Svcs. of Fla., Inc., No. 8:06-CV-1284-T-24-MSS, 2007 WL 2406993 (M.D. Fla. Aug. 20, 2007).

In the absence of direct evidence of intentional discrimination, a plaintiff may proceed on the basis of circumstantial evidence, in which case the Court applies the burden shifting analysis adopted by the Eleventh Circuit in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973)). See, e.g., Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir. 1998). If the plaintiff makes a *prima facie* case, discrimination is presumed. Id. The defendant can rebut the presumption by "articulating a legitimate, non-discriminatory reason" for the adverse decision. Id.; McDonnell-Douglas Corp., 411 U.S. at 802. The defendant's burden at the rebuttal stage, which is one of production, rather than

proof, is "exceedingly light." Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983). If the defendant fails to meet this burden, the plaintiff is entitled to judgment as a matter of law, assuming the trier of fact believes the evidence offered in support of the *prima facie* case. Walker,158 F.3d at1183.

If the defendant is successful in producing a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination created by the McDonnell Douglas framework "drops from the case," and the plaintiff "must then persuade the trier of fact that the defendant intentionally discriminated against [him] despite the defendant's assertion of a lawful reason for the challenged [adverse] decision." Id. (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981)). This showing of "pretext" may be demonstrated "either directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." Sweat v. Miller Brewing Co., 708 F.2d 655, 656 (11th Cir. 1983)(quoting Burdine, 450 U.S. at 256). On summary judgment, the plaintiff "must prove sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation" for the adverse decision. McDonnell Douglas, 411 U.S. at 804.

A. Direct Evidence

Sirpal first argues that he has demonstrated direct evidence of discrimination in the form of racial taunts, as well as "acquiescence in that behavior by higher-ups." Resp. p. 5.[10]

---

[10]Defendants argue that Sirpal's own allegations are not sufficient to create a genuine dispute as to whether the subject statements or complaints regarding same were indeed made, citing Solliday v. Federal Officers, No. 10-11854, 2011 WL 414283 at *1 (11th Cir. Feb. 9, 2011) ("[c]onclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion.") Although Sirpal's Declaration and deposition testimony with respect to the taunts may be uncorroborated, it is not conclusory, but rather is factual, and accordingly that language is inapplicable. Defendants also cite to the Eleventh Circuit's opinion in Norelus v. Denny's, Inc., 628 F.3d 1270 (11th Cir. 2010) which concerned a motion for sanctions which involved testimony by the plaintiff which had not been corroborated by any other source. The Court does

Because the racial taunts in this case were allegedly made by Dr. Pinto, Dr. Rodrigues, Ms. Jones and David Dweck, all non-decision makers, those comments cannot constitute direct evidence of discrimination. Standard, 161 F.3d at 1330. To the extent Sirpal argues there is direct evidence by way of "acquiescence" in racial discrimination by Dr. Potter, Dr. Bixby and Dr. Hernandez, the case cited by Sirpal, Berry v. General Motors Corp., 796 F. Supp. 1409 (D. Kan. 1992), is not binding on this Court, and in any event, does not support his position. In Berry, plaintiffs claimed that members of management "repeatedly made racial slurs and comments in the work place" and that when a plaintiff complained to management of racial slurs, he was allegedly told, "[i]n this day and age, that shouldn't bother you," and that such comments were made over a period of ten years. Id. at 1421. The court did not find that this constituted direct evidence of discrimination, but rather found this evidence sufficient to create a triable issue of fact as to pretext. Id.

In Berry, there was evidence that management had made blatant "racial slurs and comments" over a period of more than ten years, which distinguishes that case from Sirpal's allegations as to UM's faculty and administration. However, to the extent that Berry supports Sirpal's argument that Dr. Potter's alleged characterization of what Sirpal alleges to have been repeated taunts as "just jokes" may be considered as some evidence of discriminatory animus on his part, the Court will discuss that evidence *infra*, relative to pretext.[11] See also Ash v. Tyson Foods, Inc., 546 U.S. 454,

––––––––––––––––––

not find Norelus to be dispositive, in that in Norelus, at least seven witnesses who were in a position to have heard the statements and observe the alleged activity, which occurred on a near-daily basis for about a year, denied same, but none of those persons were alleged to be the persons who allegedly made the statements. Moreover, the Norelus Court found that the plaintiff herself "was never a stable or reliable witness," "exhibited emotional and erratic behavior" during her deposition, and ultimately submitted an errata sheet which made 868 changes to her deposition testimony. Id. at 1275-78. The Court has not been made aware of any similar circumstances regarding Plaintiff Sirpal. The Court therefor accepts Sirpal's testimony (but not his unsupported allegations) as true for purposes of this motion.

[11]The Court notes there is absolutely no other evidence which would support a finding of discriminatory animus on Dr. Potter's part, and indeed, all the other evidence of record suggests that Dr. Potter and Sirpal had a very good, respectful relationship.

17

456 (2006) (finding that racially based comments may be evidence of discriminatory animus and pretext, depending on circumstances).

As to Dr. Bixby's alleged advice to Sirpal not to repeat the racial allegations to anyone because it might cause Sirpal to be seen in a "bad light," the Court finds that this statement does not fall into the category of those comments discussed in Berry. Even viewing this statement in the light most favorable to Sirpal, the Court would have to make an unsupported inference in order to find that Dr. Bixby's reason for saying this was because he had a discriminatory animus himself, rather than because he actually wanted to assist Sirpal. Cf. Ali v. Stetson Univ., Inc., 340 F. Supp. 2d 1320, 1325 (M.D. Fla. 2004), aff'd, 132 Fed. Appx. 824 (11th Cir. 2005) (finding that the silence of appeals' board when asked by plaintiff's mother whether plaintiff was suspended "because of his name" was not direct evidence of discrimination).[12]

Even assuming that Sirpal had proof of discriminatory animus on the part of Dr. Potter, Sirpal fails to prove the necessary link between that discriminatory motive and the adverse actions necessary to establish causation, in that Dr. Potter was not the final decisionmaker with respect to Sirpal's dismissal from the Ph.D. Program or leave of absence from the Medical School, due to the subsequent investigations. See Llampalas, 163 F.3d at 1248. Sirpal unsuccessfully attempts to prove his case by way of the "cat's paw" theory, which is available "if the plaintiff shows that the harasser employed the decisionmaker as her 'cat's paw' - i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation." Llampalas 163 F.3d at 1249 (internal citations omitted; emphasis added).

In deciding whether to dismiss Sirpal from the Graduate Program, both the Graduate

---

[12]As to Sirpal's inadmissible double hearsay testimony that Dean Hernandez said that another professor had stated that Sirpal had previously complained to him about discrimination, because this statement was allegedly not made until sometime in 2010, long after the adverse actions alleged in the SAC (the dismissal from the Program and leave of absence from the Medical School), the Court finds that this statement is relevant to this motion, if at all, only to the extent that it corroborates Sirpal's testimony that he advised Dr. Bixby and/or Dr. Potter of racial taunts.

Committee and subsequently, Dr. Bixby, evaluated Sirpal's situation. Sirpal attempts to distinguish his case by relying on the Supreme Court's recent decision in Staub v. Proctor Hosp., 131 S. Ct. 1186 (2011).[13]  In Staub, the plaintiff submitted evidence as to frequent hostile remarks by supervisors regarding his military service, and their desire to get rid of him. One of the supervisors, Mullaly, issued an unwarranted Corrective Action against the plaintiff and then the other supervisor, Korenchuk, informed management that the plaintiff had violated the terms of the Corrective Action. Id. at 1189.  Plaintiff's personnel manager, Buck relied on the accusation by Korenchuk, and after reviewing the personnel file, she issued a termination notice, which stated that the plaintiff "had ignored the directive issued in the January 2004 Corrective Action." Id.  The plaintiff challenged the termination through his employer's grievance process, alleging that Mullaly had fabricated the allegation underlying the Corrective Action out of hostility to his military service.  Buck did not follow up with Mullaly, and after discussing the situation with another personnel officer, Buck adhered to her decision.  The plaintiff alleged that Mulally and Korenchuk had hostility to his military obligations and that their actions influenced Buck's ultimate employment decision. Id. at 1190.  The jury found that Staub's "military status was a motivating factor in [the employer's] decision to discharge him" and awarded damages. Id.  The Seventh Circuit reversed, finding that Plaintiff could not succeed under the cat's paw theory because Buck had relied not only on what Mulally and Korenchuk said, but also on the conversation with her co-worker and her review of the personnel file. Id.

On review, the Supreme Court initially noted that intentional torts such as discrimination, "generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" Id. at 1191 (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998)) (emphasis in original).  In Count

---

[13]The Court summarily rejects Sirpal's contention (which, in any event, is argument and conjecture) that "everyone from Potter on up simply rubber-stamped the frame-up evidence marshaled by Pinto and Jones without doing any independent investigation." Resp. p. 7. This contention clearly is belied by the evidence as to the content and extent of the subsequent investigations performed by both the Graduate School and the Medical School.

III, Sirpal has sued Dr. Pinto and Dr. Potter individually based on discrimination in connection with the "thwarting of his implied-in-fact contract with UM to provide him a professional education through its M.D./Ph.D sequence." SAC ¶68. Even assuming that Sirpal has established sufficient evidence to establish that Dr. Pinto made racial taunts, told Sirpal that he was "going to get" him and that he was "not going to last long," and that he participated in falsely planting the samples in Sirpal's freezer, Sirpal has failed to present any evidence that Dr. Pinto intended that Sirpal be dismissed from the Graduate Program or placed on a leave of absence from the Medical School, as opposed to merely intending that Sirpal be dismissed from Dr. Potter's lab.[14]

Similarly, Sirpal has failed to present any evidence that Dr. Potter intended that he be dismissed from the entire Graduate Program, or placed on a leave of absence from the Medical School. Although Dr. Potter notified Dr. Burnstein of Sirpal's dismissal from his lab, the report Dr. Potter submitted to the Graduate Committee does not reveal any such intent, but rather concludes that the incidents "have so upset the lab members, that it is no longer tenable for [Sirpal] to remain a member of my group."[15] Potter Dec., Ex. B. Accordingly, the Court finds that Sirpal has failed to show that a genuine dispute of material fact exists as to the individual liability of either Dr. Pinto or Dr. Potter on Count III and summary judgment will be granted in their favor. See Staub, 131 S. Ct. at 1191(noting that "[i]f dismissal was not the object of Mulally's and Korenchuk's reports, it may have been their result, or even their foreseeable consequence, but that is not enough to render [them] responsible.").

---

[14]Sirpal described Dr. Pinto as "someone who has their own agenda to push forward to get me out of the lab." Sirpal Dep. vol. 1, p. 81.

[15]In his Response, Sirpal states, without citing any authority, that Dr. Bixby "acknowledge[d] that, rules or no rules, Potter's exercise of such absolute authority effectively ended Sirpal's graduate-school career - unless Sirpal could have found some other professor who would allow the department chair's personna non grata to join his or her laboratory to complete his dissertation." Resp. p. 8 (emphasis in original). Although Dr. Bixby did testify that Sirpal "would have had to do a dissertation with someone, either Dr. Potter or someone else," Dr. Bixby did not testify regarding the probability of that occurring. See Bixby Dep. p. 12.

As to the liability of UM, the <u>Staub</u> Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, [footnote omitted] and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA. [footnote omitted]." <u>Id.</u> at 1194.   <u>Staub</u> is distinguishable in that the Court there found that "there was evidence that both Mulally and Korenchuk had the specific intent to cause Staub to be terminated" (<u>id.</u>) and that "the record contains no evidence that Mulally or Korenchuk intended any particular adverse action other than Staub's termination." 131 S. Ct. at 1192 n. 2.   As noted, in Sirpal's case, there is no evidence that Dr. Potter intended the adverse actions upon which Sirpal bases his claim. Accordingly, the Court finds that Sirpal cannot succeed against UM on a cat's paw theory. See also <u>Vasbinder v. Shinseki</u>, No. 09-1239, 2011 WL 1789989, at *6 (W.D. Pa. May 10, 2011); <u>Hysten v. Burlington Northern Santa Fe Railroad Co.</u>, No. 09-3333, 2011 WL 892732, at *14 (10th Cir. March 16, 2011).

Moreover, there was no other evidence of discrimination before the Graduate Committee, in that Sirpal did not inform the Graduate Committee of any of the alleged racial taunts, or of Dr. Potter's alleged knowledge of same.   Accordingly, there can be no way that the Committee's decision could in any way have been influenced by discrimination. See <u>Llampalas</u>, 163 F.3d at 1250 (stating that "[w]hen the employer makes an effort to determine the employee's side of the story before making a tangible employment decision affecting that employee ... it should not be held liable under Title VII for that decision based only on its employee's hidden discriminatory motives.")[16]

---

[16]Sirpal concedes that he informed the Graduate Committee of his belief that Dr. Pinto had expressed "anger" at him, had "spoken ill" of him, and had framed him, albeit not because of discrimination, but because of the research paper incident. (Plf. Resp. p. 9) In light of the fact that the Committee rejected Sirpal's position that he was framed, and rather, did not believe that Sirpal was being credible as to his complicity in the incident, the Court finds that the fact that the Graduate Committee was not informed of a possible racial bias on the part of Dr. Pinto, as opposed to a bias based on Sirpal's refusal to work with him, has no relevance in determining whether the Graduate Committee's and/or Dr. Bixby's review of its decision were based on discrimination. The Court finds Sirpal's argument that subsequent investigation by Dr. Bixby was somehow "tainted" due to his alleged advice to Sirpal not to mention the racial taunts is

B.  Circumstantial Evidence

In the absence of any direct evidence, Sirpal attempts to state a *prima facie* case of discrimination by circumstantial evidence under the McDonald-Douglas burden-shifting analysis.

The Court initially notes that Sirpal cannot meet the traditional disparate treatment *prima facie* case in a Title VI context, which requires him to prove that he was "treated differently from similarly situated students who are not members of the protected class," Bell v. Ohio State Univ., 351 F.3d 240, 253 (6th Cir. 2003), due to the lack of a similarly situated student. See also Stewart v. New Castle School Dist., No. 09-725, 2011 WL 1237929, at * 5 (W.D. Pa. Feb. 18, 2011) However, even in the absence of a comparator, "summary judgment is appropriate [only] where no other evidence of discrimination is present." Wilson, 376 F.3d at 1092.

The only "other evidence" which Sirpal cites are alleged "procedural and substantive departures from the norms generally followed by the decision-maker, " cited by the Court in Elston v. Talladega County Bd. of Educ., 997 F.2d 1394 (11th Cir. 1993) as a method of proving intentional discrimination in Fourteenth Amendment Equal Protection context. Id. at 1406 (stating that "[d]iscriminatory intent may be proven by evidence of such factors as substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements in the legislative or administrative history of the decision"). However, Sirpal has failed to cite a single case where any alleged "norm" was followed in circumstances similar to his.

With respect to the procedures followed by the Graduate Program, Sirpal argues that he was not given the protections offered by the UM and Medical School Handbooks. However, Sirpal has failed to establish that the Handbooks established the "norm" which was followed by the Graduate Program with respect to graduate students who had been charged with non-academic misconduct. There is no dispute that the Graduate Program followed what was the "procedure," albeit unwritten,

---

speculative and unsupported.

at the time. Both Dr. Scandura and Dr. Bixby testified that it had been applied before with respect to academic dismissals, and once to non-academic misconduct. Although the Medical Student Handbook states that graduate students are subject to the policies contained therein, it also states that "[s]tudents are also subject to rules and regulations that apply to academic programs of the various academic schools and colleges" and that "other University rules and regulations may apply." Hernandez Dec., Ex. A at 3.

Sirpal also maintains that he should have been given the procedural protections provided in the UM Handbook pertaining to Honor Code violations. Although the UM Handbook provides that a student who violates the University Code of Conduct "may be charged" under the "University Disciplinary Procedures" or the "Major Disciplinary Procedures," (Scandura Dep., Ex. 1 pp. 72, 78) it does not state that they must be charged under those procedures. Rather, the UM Handbook provides that "[s]tudents are also subject to rules and regulations that apply to academic programs of the various academic schools and colleges, including but not limited to, the Undergraduate and Graduate Honor Codes." Id. at p. 3.[17]

Sirpal cites to an April 18, 2008 email from Dr. Bixby to Dr. Scandura in which Dr. Bixby agrees that her suggestion to send the matter involving the lab samples to the Dean of Students as an Honor Code violation matter "might be the best course." Bixby Dep. pp. 95-97, and Ex. 13. However, in that same email, Dr. Bixby further states that he wanted to talk to Dr. Bookman and that "[t]here is some question about whether the issue in question would technically be an Honor Code violation or something else." Id. Dr. Bixby testified that following that email, he did discuss the matter with Dr. Bixby, that they "looked at the Honor Code and ... looked at the academic bulletin, and together, ... we jointly decided that it really wasn't a matter of an Honor Code violation." Id. at 55-56, 97. Dr. Bixby additionally testified that UM also spoke with general counsel about the issue.

---

[17]To the extent that Sirpal further maintains that he should have been charged under the PPAP, that process was also permissive, and not exclusive.

Id.[18] Dr. Bookman stated that he thought it would be reasonable for Dr. Bixby to hear the appeal from the Graduate Committee, which could be followed by an appeal to the Dean of the Graduate School. Bixby Dep. p. 55.

In further arguing: "nor does UM offer any evidence that the medical school's placement of Sirpal on an involuntary leave of absence involved any more searching inquiry than did either that conducted by Burnstein's committee or Bixby - ..." (Resp. p. 10), Sirpal improperly attempts to shift the burden to Defendant. Under the McDonald Douglas analysis, it is Sirpal's burden to establish a *prima facie* case, and the Court finds that he has failed to do so.[19]

Even assuming that Sirpal had stated a *prima facie* case of discrimination, clearly, UM has proffered a legitimate, non-discriminatory reason for dismissing Sirpal from the Graduate Program and placing him on a leave of absence from the Medical School. The Court finds that Sirpal's limited evidence in the form of the alleged comment by Dr. Potter (who was not a decisionmaker), even if considered along with the advice allegedly given by Dr. Bixby not to discuss the alleged incidents of discrimination, constitute only a scintilla of evidence and do not create a genuine dispute of fact on the issue of pretext, in light of the entire record. See Dorrego v. Public Health Trust of Miami Dade County, 293 F. Supp. 2d 1274, 1284(S.D. Fla. 2003) (stating that "[w]hen racial remarks are submitted as evidence of pretext, but are not direct evidence of discrimination because they are either too remote in time or too attenuated, they may provide circumstantial evidence that, when read in conjunction with the entire record, show a decisionmakers' discriminatory attitude" but also that "under the circumstantial evidence standard, without additional persuasive evidence of

---

[18]When asked why it would not have been an Honor Code violation in light of the fact that he had referred to the incident as "[t]he alleged theft of protein samples," (Bixby Dep. Ex. 10), Dr. Bixby explained that "people within a laboratory can't steal laboratory samples from each other, because they belong to the laboratory, not to any one individual." Bixby Dep. p. 92.

[19]As to the leave of absence, Sirpal had a hearing, and filed an appeal with the EPC, as well as the Dean. There is no requirement that the Dean hear the appeal within a specific period of time, and Sirpal has not presented any evidence of any "norm" which was not followed as to that appeal.

pretext, a derogatory remark, standing alone, is insufficient to create an issue of fact on pretext") (citing Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1230 (11th Cir. 2002)).[20]

The Court finds that on the record before it, Sirpal has failed to establish that a genuine dispute of fact exists as to intentional discrimination on the party of Dr. Pinto, Dr. Potter or UM in connection with his dismissal from the Graduate Program or the decision to place him on a leave of absence from the Medical School. Accordingly, summary judgment on Counts I and III will be granted in favor of all Defendants.

### III.   Count II - Breach of Contract

In Count II, Sirpal alleges that UM breached its contract with him by failing to supply him with (1) the "due process rights" contained in the UM Handbook and the Medical School Handbook; (2) reasonable access to his academic records; and (3) a reasonably prompt and fair investigation into the allegations of research misconduct.

"[U]niversity faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 n. 11 (1985) (citations omitted). A determination of "whether a student is qualified to be a physician is an academic judgment that 'requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial

---

[20]The Court further finds no evidence as to pretext in Sirpal's criticism of the fact that the Graduate Committee and/or Dr. Bixby accepted Dr. Potter's version of the incident over his own, and did not interview certain witnesses, as well as Sirpal's position that he was innocent of the charges made against him. See Ross v. City of Perry, Ga., No. 09-15392, 2010 WL 3667023, at *2 (11th Cir. Sept. 22, 2010)(finding that the plaintiff's "many disagreements with how the evaluation was conducted or how other employees involved with the ... incident were disciplined do not illustrate pretext"); see also Wilson, 376 F.3d at 1092 ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex."); Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) (stating that the pretext inquiry "centers upon the employer's beliefs, and not the employee's own perceptions of his performance"); Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) (plaintiff cannot establish pretext merely by questioning the wisdom of the employer's reasons where the reason is one that might motivate a reasonable employer).

or administrative decisionmaking.'" <u>Bd. of Curators of Univ. of Mo. v. Horowitz</u>, 435 U.S. 78, 90 (1978); <u>see also</u> <u>Sharick v. Southeastern Univ. of the Health Sciences, Inc.</u>, 780 So. 2d 136, 138 (Fla. 3d DCA 2000). Therefore courts accord "great deference ... to private universities in setting degree requirements." <u>Jallali v. Nova Southeastern Univ., Inc.</u>, 992 So. 2d 338 (Fla. 4th DCA 2008).

Under Florida law, a private college "may set forth the terms under which it will admit and subsequently graduate students who subject themselves to the rules, regulations and regimen of the college," thereby creating an implied contract with the student. <u>University of Miami v. Militana</u>, 184 So. 2d 701, 704 (Fla. 3d DCA 1966); <u>see also</u> <u>Jarzynka v. St. Thomas University School of Law</u>, 310 F. Supp. 2d 1256, 1268-69 (S.D. Fla. 2004). The "terms and conditions for graduation are those offered by the publications of the college at the time of enrollment." <u>Id.</u>   The implied contract provides that if the student fully complies with the rules and regulations of the institution, then the university will confer to him a degree. <u>John B. Stetson Univ. v. Hunt</u>, 102 So. 627, 640 (Fla. 1924). That being said, a private university has broad discretion in what rules and regulations it shall issue and how it enforces its rules." <u>Id.</u>

"A court will not interfere with a private university's enforcement of its regulations unless the university has acted arbitrarily and capriciously, in violation of a constitution or statute, or for fraudulent purposes." <u>Jallali</u>, 992 So. 2d at 342; <u>see also</u> <u>Robinson v. University of Miami</u>, 100 So. 2d 442, 444 (Fla. 3d DCA 1958) (stating that university may reserve right to have a student withdraw at any time after his acceptance as long as it acts in good faith and not arbitrarily or from malice).[21] A decision is "arbitrary" if it is "founded on prejudice or preference rather than on reason or fact." Black's Law Dictionary (7th ed. 1999); <u>see also</u> <u>Militana</u>, 185 So. 2d at 703 (defining "arbitrary" as

---

[21]Sirpal alleges that he has successfully completed all of his academic requirements for the M.D./Ph.D program. However, "[s]uccessful completion of all academic requirements does not guarantee conferment of a degree." <u>McCawley v. Universidad Carlos Albizu</u>, 461 F. Supp. 2d 1251, 1259 (S. D. Fla. 2006) (affirming summary judgment in favor of school that withheld Psy.D. degree from student whose history included egregious plagarism, concealing two arrests, and impersonating a licensed psychologist.).

"nonrational," "not done according to reason or judgment," without fair, solid and substantial cause") (quoting Black's Law Dictionary (5th ed. 1951)). This standard applies with respect to disciplinary decisions. See, e.g., McCawley v. Universidad Carlos Albizu, Inc., 461 F. Supp. 2d 1251, 1257-1258 (S. D. Fla. 2006).[22]

To the extent that Sirpal argues that his dismissal from the Graduate Program was arbitrary, that argument is rejected based on the thorough investigations conducted by the Graduate Committee, Dr. Bixby and Dr. Scandura. Sirpal has failed to show that any of the procedures he cites in any of UM's documents were mandatory and/or exclusive, and fails to establish that UM's decision to apply the Graduate School's procedure was arbitrary, malicious, or in bad faith. Rather, in the light most favorable to Sirpal, the evidence merely shows that UM could have chosen to take another route for the disciplinary review, but did not.

Sirpal next argues that UM acted arbitrarily by placing him on a leave of absence. The Medical Student Handbook provides that "A leave of absence for disciplinary reasons can be recommended by ... the medical education administration for professional misconduct *or other reasons*." Hernandez Dec., Ex. A at 24 (emphasis added). The Court finds that the reasons given by UM were based on reason and were not arbitrary, based on bad faith or malice. Sirpal was allowed to appear with the MEA to discuss his future at the Medical School and to respond to any possible recommendation, was given written notice of his leave and told the conditions upon which he could petition for return to the Medical School. Hernandez Dec. Ex. I; Bixby Decl. ¶47. Sirpal availed himself of the right to appeal the decision, and the Handbook states that the Dean has discretion whether or not to entertain an appeal. (Hernandez Dec., Ex. A at 21). Moreover, Sirpal's appeal has now been rendered moot by his dismissal from the Medical School.

Sirpal next argues that the hold on his transcript was arbitrary. However, the reasons for this

_____

[22]Sirpal's argument that the University's contract is "illusory," thus imposing a good faith requirement, does not add to the analysis.

27

action were explained by Dr. Hernandez, who discussed the school's policy with respect to holding transcripts for tuition reimbursement purposes, and the fact that at the time the transcripts were placed on hold, "Sirpal's status at the Medical School was uncertain, warranting a review from the MEA as to his continued status," and the transcripts were held "to ensure the accuracy and thoroughness of the transcripts ... until all investigations and questions regarding Sirpal's status were resolved." Hernandez Decl. ¶¶ 11- 12; see also Bookman Decl. ¶ 11. The Court rejects Sirpal's position that this decision was in bad faith, arbitrary, or malicious.[23]

Finally, Sirpal argues that the research misconduct investigation was a "sham" because UM did not examine "the silver MacIntosh laptop to which Potter uploaded the image of the gel that Sirpal gave him September 5, 2007, prior to returning the image to Sirpal, labeled and manipulated, several days later." Resp. p. 15.[24] The Court notes that the investigation had not been completed at the time that Sirpal filed the SAC. Therefore, the Court finds Sirpal's limited challenge to the nature of the investigation to be premature. Furthermore, Dr. Potter testified that Kroll did not examine his computer because at the time the investigation was conducted, he was out of town and had the computer with him. Dr. Potter did not testify that the computer was indeed a Silver MacIntosh; rather, he stated although he had at one time used such a computer, he could not recall what type of computer he used in 2007. Potter Dep. pp. 15-16. Sirpal has presented no evidence that anyone associated with UM who was conducting the investigation was aware that Dr. Potter's

---

[23]Sirpal references testimony from Dr. Hsu at UF that Sandra Lemmon, UM's Director of UM's M.D./Ph.D. program, told Dr. Hsu that she would do anything in her power to prevent Sirpal from transferring. Hsu Dep. p. 46. The Court does not find this statement alone to be evidence of discrimination, bad faith or malice as to Sirpal, particularly in light of the testimony that she also made this statement in reference to another student who was attempting to transfer at the time. Id. at 45-46.

[24]Sirpal states in his Declaration that in September 2007 he had given Dr. Potter "the raw images for the JBC article on a jump drive which Potter than loaded onto his silver Macintosh laptop to label," and that Dr. Potter, "shortly thereafter, gave [him] the labeled images back ... on a jump drive" and it was that image that was published. Sirpal Dec. ¶12.

computer had not been examined.

Moreover, the Court would hesitate to find that one overlooked factor, even if it could be characterized as a "mistake" in an investigation renders the entire investigation a "sham." As Sirpal offers no other evidence that this investigation was a "sham," or otherwise arbitrary, malicious or in bad faith,[25] and in light of the other evidence concerning the extent to which UM went to resolve the research misconduct issue, this claim of breach of contract is rejected.[26]

Summary judgment in favor of Defendant UM will be granted as to Count II.

## IV. Defamation/Counts IV, V, VII, VIII and IX

In order to prove a claim of defamation under Florida law, a plaintiff must show that (1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused the plaintiff injury. Fortson v. Colangelo, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006). "[W]ords are defamatory when they charge a person with an infamous crime or tend to subject one to hatred, disgust, ridicule, contempt or disgrace or tend to injure one in one's business or reputation." Id. at 1378, n. 11 (quoting Seropian v. Forman, 652 So. 2d 490, 495 (4th DCA 1995) (citation omitted)).

"A statement made by one having an interest or duty in the subject matter thereof, to another person having a corresponding duty or interest therein, is conditionally privileged, even though the statement might be false and otherwise actionable." Jarzynka, 310 F. Supp. 2d at 1267. If a speaker's statements are privileged, the privilege may only be defeated by a showing of express malice. Id. at 1268. Express malice is defined as "ill will, hostility and an evil intention to defame

---

[25]In the SAC, Sirpal had also alleged that the investigation was not conducted within 120 days as required by the Research Misconduct Policies and Procedures manual (SAC ¶44), but appears to have abandoned this argument in light of the Declaration of Dr. Bookman, who states that several extensions were requested and granted.

[26]The Court further finds that to the extent UM, as a private university, was required to provide Sirpal with "due process" in connection with the disciplinary actions against him, it did so.

and injure." <u>Lewis v. Evans</u>, 406 So. 2d 489, 492 (Fla. 2d DCA 1981). "[W]hen the circumstances surrounding the communication are undisputed," the issue of whether a qualified privilege exists should be decided by the Court. <u>Cape Publications, Inc. v. Reakes</u>, 840 So. 2d 277, 280 (Fla. 5th DCA 2003) (citing <u>Nodar v. Galbreath</u>, 462 So. 2d 803, 810 (Fla. 1984)).

A statement of pure opinion is not actionable. <u>Hay v. Indep. Newspapers, Inc.</u>, 450 So. 2d 293, 295 (Fla. 2d DCA 1984) (citing <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974)). However, a statement of "mixed opinion" is not protected. <u>Id.</u> The difference has been explained as follows:

> Pure opinion occurs when the defendant makes a comment or opinion based on facts which are ... otherwise known or available to the ... listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated ... or assumed to exist by the parties to the communication.

<u>From v. Tallahassee Democrat</u>, 400 So. 2d 52, 57 (Fla. 1st DCA 1981) (citation omitted); <u>see</u> <u>Hay</u>, 450 So. 2d at 295 (calling plaintiff "a crook and a criminal" not actionable because criminal charges were either known or readily available to the public). The question of whether a statement is one of fact or of opinion is a question of law for the court. <u>Id.</u>

A.   <u>Count IV - Defendant Rodrigues</u>

Sirpal alleges that Defendant Rodrigues (1) "allege[d] in September 2007 that Plaintiff had violated § B.10 of the Student Code of Conduct by accessing Rodrigues's UM computer without authorization and sending e-mails from her account" (SAC ¶17) and (2) "identified Sirpal in an interview with a UM investigator as 'a former student' with whom she had 'experienced ... problems ...'" (SAC ¶19).

Sirpal has presented no evidence that Dr. Rodrigues made the first alleged statement.[27] As

---

[27]In his Response, Sirpal references testimony from Dr. Bixby, in which he stated that he had a conversation with Dr. Rodrigues which he described as follows: "[s]he believed, I guess that [Sirpal] had ... hacked into her computer"(Bixby Dep. p. 22). <u>See</u> Plf. Resp. to Def. Stmt. of Facts at ¶17. However, that conversation allegedly took place not in September of 2007, but

to the second statement, the evidence shows that on September 14, 2007 when Mr. Michaud asked Dr. Rodrigues about "any issues she may have had with anyone capable of sending these emails," Mr. Michaud noted that she was "extremely reluctant to speculate on who would have sent the emails." Rodrigues Dep. Ex. 18, p. 3. It was only when Dr. Rodrigues was "asked to name anyone who she had recently experienced any problems with" that she stated that Sirpal, whom she described as a "former student" was the only person she could think of. Id.

The Court finds no actionable defamation as to this statement. Dr. Rodrigues did not identify Sirpal by name as the person who she believed accessed her computer. Dr. Rodrigues's statement that she had experienced "problems" with Sirpal, a former student in the lab, cannot be classified as a false statement, in that Dr. Rodrigues testified that Sirpal "was not taking advice" from her, and after she received an email from him she found his attitude towards her to be aggressive. (Rodrigues Dep. pp. 35, 52-53). Indeed, Sirpal conceded that he and Dr. Rodrigues had "certain disagreements" with respect to things that went on in the lab (Sirpal Dep. vol. III, p. 300-01) and that he was a "former student who worked in the lab." Id. at 299.

Accordingly, summary judgment will be granted as to Count IV.[28]

B.  Count V - Defendant Pinto

Sirpal sues Dr. Pinto for defamation based on three allegedly defamatory statements, which the Court will address in turn.

1.  Statement to Lee Michaud

Sirpal first argues that Dr. Pinto told Mr. Michaud that he "was concerned that Sirpal may attempt to sabotage his experiments or those of others in the lab" (SAC ¶24).

The Court finds that this was not a false statement of fact concerning Sirpal, but rather was

---

rather during Dr. Bixby's 2008 investigation of Sirpal's involvement in the allegedly stolen research samples (id.), and is therefore not the subject of Count IV.

[28]The Court need not reach the issue of privilege.

31

an expression of Dr. Pinto's opinion as to what Sirpal might do in the future, and therefore is not actionable. See Lluberes v. Uncommon Productions, LLC, 740 F. Supp. 2d 207, 225-26 (D. Mass. 2010).[29]

### 2.   Statements regarding missing vials

The other allegedly defamatory statements are that Dr. Pinto stated that he "had come into the laboratory Sunday, had discovered vials of protein missing from his freezer box, and had then found those vials, along with others from Jones's freezer box (that Potter had told Sirpal in June 2007 that he could use), in Sirpal's freezer box with labels written in Sirpal's handwriting, and had photographed the evidence." (SAC ¶26); and "asserted that Sirpal had instructed a laboratory fiber technician, Jiang-Sheng Liang, Ph.D., to use one of Pinto's vials for an experiment, a written record of which experiment Pinto and Jones presented to Potter as evidence of Sirpal's theft of their protein vials." SAC ¶27.

Defendants argue that these statements are not actionable because they are "true." Because Sirpal has testified that he "did not steal the samples," (Sirpal Dec. ¶9), the Court finds that there are disputed issues of fact as to whether the alleged statements are true, and if not, whether they were made with malice on the part of Dr. Pinto such as to preclude the application of a privilege.[30] Accordingly, summary judgment as to Count V will be denied.

### C.   Count VII - Dr. Potter and UM

Count VII is based on Dr. Potter's March 12, 2008 memorandum informing the Graduate Committee that he had dismissed Sirpal from his lab "due to several incidents that occurred and were brought to my attention by various lab members," which included the following:

---

[29]The Court need not reach the issue of privilege.

[30]UM addresses several other statements allegedly made by Dr. Pinto to the Full Investigative Committee which Sirpal listed in his Responses to Defendants' First Set of Interrogatories. Because those statements were not alleged in the SAC, they are not part of this Count.

32

a. "We discovered that samples that had been prepared by Dr. Jose Pinto had been taken from Dr. Pinto's freezer box (without his permission) and relabeled (in Sanjeev's handwriting) with exactly the same text including the names of proteins, protein concentrations, etc. and with Sanjeev's intials ..."

b. "Other proteins were also discovered in Sanjeev's box, ... which [were] also missing from Dr. Pinto's freezer box...."

c. Protein samples that Jones "did not give [Sirpal] permission to take" also had "disappeared" from Jones' stock and were found in Sirpal's freezer box.

SAC ¶ 33.

Even assuming for purposes of this motion that these statements can be classified as "false," because the statements were made as part of an investigation, Dr. Potter may claim a qualified privilege, unless Sirpal can show malice. In the SAC, Sirpal alleges that Dr. Potter's "primary motivation" for making these statements "was to cover up his own research misconduct by being able to blame the alteration of the *JBC* image on Sirpal." SAC ¶94. However, he offers no evidence of same.

In any event, when Defendants' response notes that Dr. Potter's memorandum to the Graduate Committee does not even concern the JBC article, Sirpal changes his position to be that malice can be inferred from Dr. Potter's response to Sirpal's complaints regarding the alleged racial taunts, which occurred shortly before his dismissal from the lab and the preparation of the memo. To the extent that Dr. Potter's response could be considered evidence of malice, Sirpal improperly attempts in his Response to change the allegations of the SAC. Because there is no genuine dispute that Dr. Potter may validly claim a qualified privilege as to the statements made to the Graduate Committee, and there is no evidence that Dr. Potter was motivated by malice as alleged by Sirpal in the SAC, summary judgment will be granted as to Count VII.

D.   Count VIII - Dr. Potter and UM

This Count is based on the following statements, which Sirpal alleges that Dr. Potter made to the PIC during the scientific research misconduct investigation:

a. Sirpal never showed [Dr. Potter] the raw data for the manuscript published in the JBC;

b. Sirpal never showed [Dr. Potter] the actual gel depicted in Figure no. 3 in the article; and

33

c. Sirpal could not have done the 75 fiber experiments that underlie Sirpal's conclusions in the article.

SAC ¶37.

As to the first statement, Dr. Potter testified (and the memorandum concerning the interview reflects) that although he stated to the PIC Committee that Sirpal never showed him the raw data for the manuscript published in the JBC, he indicated that this was <u>after</u> he requested the data in the wake of the concerns raised over the validity of the Article. Potter Dec. ¶15, Ex. H at 2.  Defendants argue that this statement was true. Dr. Potter denies that he made the second and third statements as alleged by Sirpal.  As to the second statement, Dr. Potter testified (and the memorandum concerning the interview reflects) that he told the PIC that Sirpal actually showed him several gels, including the one that was used in the Article. <u>Id.</u> With respect to the third statement, Dr. Potter declares (and the memorandum concerning the interview reflects) that he advised the PIC that he had asked Dr. Liang for <u>his</u> opinion as to whether Sirpal could have completed all 75 exhibits, and Dr. Liang said no. <u>Id.</u>

Sirpal does not present any evidence to contest Dr. Potter's version of the statements to the PIC. The Court therefore finds that these statements are not actionable and that Defendants are entitled to summary judgment as to Count VIII.[31]

E. Count IX - Dr. Potter and UM

Sirpal alleges that Dr. Potter told Dr. McCormack of UF "that Sirpal had altered the image that appeared in the JBC article." SAC ¶52. Although there is an issue of fact as to whether Dr. Potter commented on or gave Dr. McCormack any information about Sirpal's situation at UM, the evidence, read in the light most favorable to Sirpal, suggests that on July 7, 2008, Dr. Potter told Dr.

---

[31]In his Responses to Defendants' First Set of Interrogatories, Sirpal alleges that Dr. Potter made certain additional allegedly defamatory statements to the Full Investigative Committee during the research misconduct investigation.  Because those statements were not alleged in the SAC, they are not part of this Count.

McCormack that there was "some concern about some of the data in the paper" and responded in the affirmative when Dr. McCormack asked him whether there had been "an allegation of research misconduct on the part of Mr. Sirpal." McCormack Dep. p. 26-27 (emphasis added). This evidence does not create a genuine dispute as to whether Dr. Potter told Dr. McCormack at UM "that Sirpal had altered the image that appeared in the JBC article." (emphasis added). Accordingly, Defendants are entitled to summary judgment as to Count IX.

## V.  Tortious Interference - Counts VI and X

In order to establish a claim for tortious interference, a plaintiff must show "(1) the existence of a business relationship or contract to which a plaintiff is a party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contractual breach; (4) the absence of justification or privilege; and (5) the plaintiff suffered damages from the breach. Fernandez v. Haber & Ganguzza, LLP, 30 So. 2d 644, 646 (Fla. 3d DCA 2010).

### A.   Count VI - Dr. Pinto

Count VI asserts a claim for tortious interference with a business relationship against Dr. Pinto for his alleged interference with Sirpal's relationship with the Ph.D./M.D. program and Sirpal's assignment to Dr. Potter's laboratory.  Defendant maintains that because Defendant Pinto, as a post-doctorate fellow, was an employee of UM, there was no interference by a third party, which is required for a cause of action.  See, e.g., Salit v. Ruden, McCloskey, Smith, Schuster & Russell, P.A., 742 So. 2d 381, 386 (Fla. 4th DCA 1999).

Sirpal argues that the "privilege to interfere" which applies to employees  should not apply because Dr. Pinto "had no teaching responsibilities and no supervisory authority over Sirpal," citing Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1099 (Fla. 1st DCA 1999) (stating that "one may not be liable for tortious interference with an advantageous business relationship [only]if he is 'acting within [his] role as an employee ... in carrying out the activities which [a plaintiff alleges] constitute the "tortious interference".'") The Court finds that Dr. Pinto could have been acting within his role as an employee in reporting Sirpal's alleged misconduct regardless of whether he had any teaching

35

responsibilities or supervisory authority over him.  Accordingly, the Court finds that Dr. Pinto may claim a "privilege to interfere," unless Sirpal can prove that Dr. Pinto "act[ed] solely with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business relationship is not in the employer's best interest." Salit, 742 So. 2d at 386.

The Court finds that a genuine dispute exists as to this issue which precludes summary judgment on Count VI.

### B.   Count X - Dr. Potter and UM

Count X asserts a claim for tortious interference against Dr. Potter and UM for alleged interference with Sirpal's relationship with UF and Tufts University Medical School.  In order for interference with a relationship to be actionable, the relationship must be "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."  Ethan Allen v. Georgetown Manor, 647 So. 2d 812, 815 (Fla. 1994).

Defendants argue that Sirpal "was never offered admission" to Tufts.  Sirpal testified that he was verbally offered a place in the Ph.D. Program, pending receipt of transcripts from UM.  Sirpal Depo. vol. III, p. 365.  Sirpal alleges that he was unable to enroll at Tufts because UM "refused to either release Sirpal's transcripts or to send the letter [from the dean of students]."  SAC ¶116. However, on September 5, 2008, Sirpal received an e-mail from the Director of the M.D., Ph.D. Program which states as follows:

> The Vice-Provost for Research here at Tufts spoke with her counterpart at the University of Miami today.  As it stands now, we will have to defer action on your application to transfer to our program until the research misconduct investigation at Miami has been completed and a determination has been reached.  I'm sure this is disappointing to you, but that is the way we will have to proceed for now.

Sirpal Dep. vol. III., Ex. 34.  Based on this evidence, Sirpal has failed to demonstrate that he had an

36

agreement with Tufts "which in all probability would have been completed" if UM had sent his transcripts and dean's letter. Accordingly, the Court finds that Sirpal has no claim for intentional interference as to Tufts.

Sirpal makes his claim that Dr. Potter and UM intentionally interfered with his relationship with UF, based on its refusal to release Sirpal's transcripts and letter of good standing, Lemmon's statement to Dr. Hsu that she would do "everything in [her] power" to prevent Sirpal's transfer to UF, and Potter's conversation with Dr. McCormack. Defendants argue that Sirpal never had an "identifiable business relationship" with UF, and Sirpal's failure to obtain admission was of his own making.

Sirpal has presented evidence that on April 25, 2008 he obtained an offer of acceptance from UF which was conditioned upon receipt of transcripts and a letter of good standing from UM. At that time, although Sirpal had advised UF of his dismissal from Dr. Potter's lab, there is no evidence that he had informed UF of the pending research investigation. Dr. McCormack testified that at the time he called Dr. Potter, he "had no idea that [Sirpal's] standing in medical school was jeopardized" and that he "was confused about just the whole issue and why [UF] could get no verification of Mr. Sirpal's version of the events." McCormack Dep. p. 25.

Because the Court has already determined that UM had a valid reason for withholding the transcripts and not issuing a letter of good standing during the pending research investigation, to the extent that these actions interfered with Sirpal's admission to UM, Sirpal has failed to prove that UM's actions were unjustified. As to the statements of Dr. Lemmon and Dr. Potter, because Sirpal's acceptance was conditioned upon the receipt of transcripts and the letter, Sirpal has failed to present sufficient evidence that he would have been accepted into UF had Dr. Lemmon and/or Dr. Potter not spoken with UF officials. Accordingly, summary judgment on Count X will be granted.

Wherefore, it is hereby **ORDERED AND ADJUDGED** that the Defendants' Motion for Final Summary Judgment is hereby **GRANTED** in part and **DENIED** in part as follows:

The Motion is **GRANTED** as to Counts I, II, III, IV, VII, VIII, IX and X.

The Motion is **DENIED** as to Counts V and VI.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 25th day of July, 2011.

STEPHEN T. BROWN
CHIEF UNITED STATES MAGISTRATE JUDGE

cc:     Counsel of record

38